The **MILTON H. GREENE ARCHIVES, INC.,** Plaintiff,

v.

**CMG WORLDWIDE, INC.,** an **Indiana Corporation, and Marilyn Monroe, LLC,** a **Delaware Limited Liability Company, Anna Strasberg,** an **individual, Defendants.**

**And Consolidated Actions.**

**No. CV 05–02200 MMM (MCx).**

United States District Court, C.D. California.

July 31, 2008.

Douglas E. Mirell, Loeb & Loeb, Los Angeles, CA, Glenn H. Johnson, Leo Edward Lundberg, Jr., Mark L. Sutton, Michael Danton Richardson, Surjit P. Soni, Soni Law Firm, Pasadena, CA, R. Lawrence Bragg, Law Office of Sheila F. Gonzalez, Sacramento, CA, for Plaintiff.

Theodore J. Minch, Sovich Minch LLP, Mccordsville, IN, Michael Danton Richardson, Surjit P. Soni, Soni Law Firm, Pasadena, CA, William E. Wegner, Gibson Dunn and Crutcher, Douglas E. Mirell, Laura A. Wytsma, Benjamin R. King, Loeb & Loeb, Julian Wing–Kai Poon, Los Angeles, CA, for Defendants.

## AMENDED ORDER GRANTING DEFENDANTS' MOTION FOR RECONSIDERATION

MARGARET M. MORROW, District Judge.

Defendants The Milton H. Greene Archives, Inc. and Tom Kelley Studios, Inc. have moved under Local Rule 7–18 for reconsideration of the court's January 7, 2008 order finding that plaintiffs are not collaterally or judicially estopped from claiming that Marilyn Monroe died a domiciliary of California.

## I. FACTUAL AND PROCEDURAL BACKGROUND

### A. Past Proceedings

The Milton H. Greene Archives, Inc. filed this action against CMG Worldwide Inc., Marilyn Monroe LLC, and Anna Strasberg on March 25, 2005. On May 3, 2005, the court consolidated the case with two other actions filed in this district—*Shirley De Dienes et al. v. CMG Worldwide, Inc. et al.* (CV 05–2516)[1] and *Tom Kelley Studio, Inc. v. CMG Worldwide, Inc. et al.* (CV 05–2568).[2] On December 14, 2005, the court consolidated two additional actions with the pending case—*CMG Worldwide, Inc., et al. v. Tom Kelley Studios* (CV 05–5973) and *CMG Worldwide, Inc., et al. v. The Milton H. Green Archives, Inc.* (CV 05–7627).[3] These actions were originally filed by CMG Worldwide, Inc. and Marilyn Monroe, LLC (the "CMG Parties" or "plaintiffs") in the United States District Court for the Southern District of Indiana, and were transferred to this district pursuant to 28 U.S.C. § 1404(a) on August 9, 2005.[4] All of the actions seek to have the court resolve competing claims to ownership of the legal right to use, license, and distribute certain photographs of Marilyn Monroe.

In their complaints against The Milton H. Green Archives, Inc. and Tom Kelley Studios, Inc. (the "MHG Parties" or "defendants"), the CMG Parties assert that they own the "Right of Publicity and Privacy in and to the Marilyn Monroe name, image, and persona" that was created by "the Indiana Right of Publicity Act, I.C. § 32–36–1–1 et seq., and other applicable right of publicity laws." The CMG Parties contend that defendants have infringed this right by using Marilyn Monroe's name, image and likeness "in connection with the sale, solicitation, promotion, and advertising of products, merchandise, goods and services" without their consent or authorization.[5]

On October 6, 2006, the MHG Parties filed a motion for summary judgment. They argued, *inter alia*, that plaintiffs' right of publicity claims were preempted by the Copyright Act, 28 U.S.C. §§ 101–1332, and that, even if they were not preempted, plaintiffs had failed to adduce evidence that they had standing to assert claims based on Marilyn Monroe's right of publicity. In essence, defendants argued that, even if a posthumous right of publicity in Monroe's name, image and likeness exists, plaintiffs could not show that they were presently in possession of that right. Defendants also argued that MMLLC was judicially and collaterally estopped from claiming that Monroe was domiciled anywhere other than New York at the time of her death.

On May 14, 2007, the court granted defendants' motion for summary judgment, concluding that plaintiffs lacked standing to assert Monroe's right of publicity.[6] The

---

1. The *De Dienes* action was dismissed without prejudice on February 2, 2006, pursuant to the parties' stipulation.

2. Tom Kelley Studio, Inc. sued the same defendants as did The Milton H. Greene Archive, Inc.—CMG Worldwide Inc., Marilyn Monroe LLC, and Anna Strasberg.

3. Anna Strasberg was not a party to the Indiana actions.

4. On February 6, 2006, the court issued a scheduling order, which denominated the CMG Parties plaintiffs and the MHG Parties

defendants for purposes of the consolidated actions. The court based this order on the fact that the CMG Parties' Indiana action was the first filed action.

5. Plaintiffs' First Amended Complaint against Milton H. Greene Archives, Inc., ¶¶ 7, 24–26; Plaintiffs' First Amended Complaint against Tom Kelley Studios, Inc., ¶¶ 7, 28–30.

6. California created a descendible, posthumous right of publicity in 1984, with the passage of its post-mortem right of publicity statute. See CAL. CIVIL CODE § 3344.1 (former-

court found that Marilyn Monroe could not have devised a non-statutory right of publicity through her will, and also could not have devised a statutory right that was created only decades after her death. This conclusion was supported, in part, by the court's interpretation of the California right of publicity statute, Civil Code § 3344.1. The court determined that under the statute, a deceased personality who had died *before* the measure was enacted was deemed not to have had the capacity to transfer the subsequently created right, which was denominated a "property right[ ]," prior to death. See CAL. CIVIL CODE § 3344.1(b) (providing that a "deceased personality" could, *"before [his or her] death,"* transfer the statutory right of publicity "by contract or by means of trust or testamentary documents," but that "after the death of the deceased personality," the statutory publicity right "vest[ed]" directly in specified statutory beneficiaries (emphasis added)). Consequently, the court held that plaintiffs could not show they were entitled to assert Marilyn Monroe's posthumous right of publicity.

On November 21, 2007, plaintiff MMLLC filed a motion for reconsideration of the court's order. MMLLC based its motion on the fact that, six weeks after the order was entered, California State Senator Sheila Kuehl amended Senate Bill 771 ("SB 771") to include provisions designed to abrogate the court's ruling and clarify the meaning of California's right of publicity statute. SB 771 passed both houses of the California Legislature in September 2007, and was signed by Governor Schwarzenegger on October 10, 2007. The bill expressly provided that the statutory right of publicity created by § 3344.1 was deemed to exist at the time of death of any deceased personality who died before January 1, 1985. It also stated: "The rights recognized under this section are property rights, freely transferable, in whole or in part, by contract or by means of trust or testamentary documents, whether the transfer occurs before the death of the deceased personality, by the deceased personality or his or her transferees, or, after the death of the deceased personality, by the person or persons in whom the rights vest under this section or the transferees of that person or persons." The bill explained that, in the absence of an express provision in a will or other testamentary instrument transferring a deceased personality's right of publicity, "disposition of the publicity right[ ] would be in accordance with the disposition of the residue of the deceased personality's assets."

Citing this measure, MMLLC asked the court to reverse its conclusions (1) that "under either California or New York law, Marilyn Monroe had no testamentary capacity to devise, through the residual clause of her will, statutory rights of publicity that were not created until decades after her death"; (2) that alternatively, even if Marilyn Monroe's estate was open at the time the statutory rights of publicity were created, it "was not [an] entity capable of holding title to the rights"; and (3) that MMLLC and CMG had "no standing to assert the publicity rights they seek to enforce in this action." [7]

### B. The Court's January 7, 2008 Order

### 1. Marilyn Monroe's Posthumous Right of Publicity

On January 7, 2008, the court granted plaintiff's motion for reconsideration. It

---

ly CAL. CIVIL CODE § 990). Before passage of this act, California recognized a common law right of publicity, but that right expired on an individual's death. See *Guglielmi v. Spelling-* *Goldberg Productions,* 25 Cal.3d 860, 861, 160 Cal.Rptr. 352, 603 P.2d 454 (1979).

**7.** Pl.'s Mem. at 12.

noted that SB 771 clearly expressed the California legislature's intent to clarify § 3344.1 as originally enacted, explicitly outlining that intent in the bill and emphasizing it in the legislative history. The court observed that the bill had been passed promptly after, and in response to, the court's May 14, 2007 order, a factor of significance under California Supreme Court law addressing when subsequently passed bills should be considered clarifications, rather than modifications, of existing law. Finally, in light of SB 771, the court reconsidered the text of § 3344.1 as originally enacted, and found there was a potential ambiguity that the clarifying legislation addressed. It concluded that the definition of "deceased personality" in § 3344.1(h) injected ambiguity into the court's earlier construction of § 3344.1(b), i.e., its conclusion that subsection (b) permitted transfer of the statutory right of publicity after a personality's death only by the personality's heirs. Because the statute defined a "deceased personality" as "any ... natural person who ... died within 70 years prior to January 1, 1985," and because subsection (b) provided that a "deceased personality" could transfer the statutory right before his or her death, the court concluded that whether the legislature intended to provide that a predeceased personality could transfer the right through his or her will was ambiguous. The court noted that this potential ambiguity had caused beneficiaries, particularly charitable beneficiaries, of deceased personalities to act in a manner that conflicted with its earlier interpretation of the statute, and that it had resulted in court decisions that were at odds with what the 2007 legislature believed the earlier legislature had intended.

In combination, the court found that these circumstances supported a finding that SB 771 clarified existing law by making explicit the fact that the right of publicity of a personality who died before January 1, 1985 was deemed to have existed at the time the personality died, such that it could pass through the residual clause of her will. As a result, the court determined that it was appropriate to reconsider its ruling that MMLLC lacked standing to assert claims for infringement of Marilyn Monroe's statutory right of publicity. Interpreting § 3344.1 as clarified, the court held that because Marilyn Monroe's statutory right of publicity was deemed to have existed at the time of her death, and because it was not expressly bequeathed in her will, it was transferred under the residual clause of the will to Lee Strasberg and other residuary beneficiaries. Additionally, because SB 771 made clear that a deceased personality's posthumous right of publicity was "freely transferable or descendible by contract, trust, or any other testamentary instrument by any subsequent owner of the deceased personality's rights ...," the court determined that when Lee Strasberg died, his property, which, under SB 771, was deemed to include Monroe's publicity right, passed by will to his wife, Anna Strasberg. Anna Strasberg and the holder of a 25 % interest in the residue of Monroe's estate, in turn, formed MMLLC and transferred their interest in Monroe's estate, including, without limitation, the right of publicity, to MMLLC. As a result, the court found that, under § 3344.1 as clarified, MMLLC possessed Monroe's posthumous right of publicity, and vacated its prior ruling that MMLLC lacked standing to assert the right.[8]

---

**8.** On January 20, 2008, the court denied defendant Milton H. Greene's motion for certification of the order granting plaintiffs' motion for reconsideration under 28 U.S.C. § 1292(b), and for a stay of the case.

The court made clear that these holdings were conditional, in the sense that they were dependent on a finding that Monroe was a domiciliary of California when she died. The parties agreed that Monroe could only have been a domiciliary of New York or California at the time of her death. Unlike California, New York did not recognize either a common law or statutory posthumous right of publicity in 1962. See, e.g., *Pirone v. MacMillan, Inc.*, 894 F.2d 579, 585–86 (2d Cir.1990) (observing that, under New York law, the right of publicity is exclusively statutory, is personal to the individual, and is extinguished upon his death (citations omitted)). Whether Monroe could bequeath such a right, therefore, depended on whether she was domiciled in California or in New York.

### 2. Reconsideration of the Order

#### a. Domicile

In their original motion, defendants argued that plaintiffs were judicially estopped from asserting that Monroe was domiciled in California at the time of her

death. The court did not address that question in its original order because it determined that MMLLC lacked standing to assert the right under § 3344.1 in any event. Having reconsidered the standing question, the court concluded that it was necessary to address domicile.[9]

MMLLC asserted that the court should not summarily adjudicate the issue of domicile, since discovery was ongoing and it had recently come into possession of thousands of documents potentially bearing on whether Monroe was a domiciliary of California or New York. Given this representation, the paucity of evidence in the record regarding Monroe's domicile, and the fact that defendants' motion was premised on an assertion that MMLLC could not adduce evidence of California domicile, the court concluded that defendants' motion was premature and declined to decide the issue on the basis of an incomplete record.

#### b. Collateral Estoppel

The court also addressed the argument in defendants' original motion that summary judgment should be entered in their

9. " 'A person's domicile is her permanent home, where she resides with the intention to remain or to which she intends to return.' " *Gaudin v. Remis*, 379 F.3d 631, 636 (9th Cir. 2004) (quoting *Kanter v. Warner–Lambert Co.*, 265 F.3d 853, 857 (9th Cir.2001)). " 'A person residing in a given state is not necessarily domiciled there.' " *Id.* (quoting *Kanter*, 265 F.3d at 857); see also *Weible v. United States*, 244 F.2d 158, 163 (9th Cir.1957) ("Residence is physical, whereas domicile is generally a compound of physical presence plus an intention to make a certain definite place one's permanent abode, though, to be sure, domicile often hangs on the slender thread of intent alone, as for instance where one is a wanderer over the earth. Residence is not an immutable condition of domicile").

Because a person may only have one domicile at a time, "a person's old domicile is not lost until a new one is acquired." *Lew v. Moss*, 797 F.2d 747, 750 (9th Cir.1986) (citing *Barber v. Varleta*, 199 F.2d 419, 423 (9th

Cir.1952), and Restatement (Second) of Conflicts §§ 18–20 (1971)). "A change in domicile requires the confluence of (a) physical presence at the new location with (b) an intention to remain there indefinitely." *Id.* (citing *Owens v. Huntling*, 115 F.2d 160, 162 (9th Cir.1940); 13B C. Wright, A. Miller, & E. Cooper, Federal Practice and Procedure § 3613, at 544–45 (1984 & Supp.1986)). Among the factors courts consider in determining domicile are an individual's "current residence, voting registration and voting practices, location of personal and real property, location of brokerage and bank accounts, location of spouse and family, membership in unions and other organizations, place of employment or business, driver's license and automobile registration, and payment of taxes." *Id.* (citations omitted). "[C]ourts have also stated that domicile is evaluated in terms of 'objective facts.' " *Id.* (citations omitted). Thus, the determination of a party's domicile is a mixed question of law and fact. *Id.*

favor on the basis of collateral and/or judicial estoppel. Defendants argued that MMLLC was collaterally estopped from asserting that Monroe was domiciled in California at the time of her death, citing (1) *Frosch v. Grosset & Dunlap, Inc.,* 75 A.D.2d 768, 427 N.Y.S.2d 828 (App.Div. 1980); (2) the Report of Appraiser filed December 30, 1969 in Monroe's probate proceedings; and (3) a 1975 opinion of the California State Board of Equalization ("BOE").

The court concluded that defendants were not entitled to summary judgment on the basis that the *Frosch* decision collaterally estopped plaintiffs from arguing that Monroe was domiciled in California because they had not met their burden of showing "an identity of issue which has necessarily been decided in the prior action and is decisive of the present action." See *Buechel v. Bain,* 97 N.Y.2d 295, 304, 740 N.Y.S.2d 252, 766 N.E.2d 914 (2001) (citing *Gilberg v. Barbieri,* 53 N.Y.2d 285, 291, 441 N.Y.S.2d 49, 423 N.E.2d 807 (1981)). *Frosch* examined whether the Estate of Marilyn Monroe could assert that publication of a book titled "Marilyn" invaded Monroe's right of publicity. *Frosch,* 427 N.Y.S.2d at 828. The Appellate Division of the New York Supreme Court determined that "[t]he statutory right of privacy applies to the name, portrait or picture of 'any living person' (Civil Rights Law, § 50); and it is thus on its face not applicable to the present book." *Id.* The estate contended, however, "that there [was] an additional property right, a right of publicity which survive[d] the death of Miss Monroe and belong[ed] to [it]." *Id.* As respects this right, the court held that "[n]o such nonstatutory right ha[d] yet been recognized by the New York State courts." *Id.* (citing *Wojtowicz v. Delacorte Press,* 43 N.Y.2d 858, 403 N.Y.S.2d 218, 374 N.E.2d 129 (1978)). It went on to state that even if such a right existed, defendant's book was a "literary work[,] ... not simply a disguised commercial advertisement for the sale of goods or services," and that "protection of the right of free expression [was] so important that [it] should not extend any right of publicity, *if such exists,* to give rise to a cause of action against the publication of a literary work about a deceased person." *Id.* (emphasis added).

Although defendants argued that "where Marilyn Monroe was domiciled at the time of her death was foundational to whether the Estate of Marilyn Monroe had a right to publicity," the court disagreed, concluding .that the Appellate Division's decision turned on the fact that the book was a literary work, and that freedom of speech considerations outweighed any right of publicity that might exist. The court noted that there no indication in the opinion that the parties had raised domicile or that it had been necessarily decided by the New York court. It declined to find that the Appellate Division's observation regarding the lack of a posthumous right of publicity in New York implied a decision regarding Monroe's domicile.

The court similarly found that defendants had failed to show that Monroe's domicile at death was definitively decided by the California BOE or the New York Surrogate's Court. The BOE's opinion stated that "[a]t the time of her death in 1962, Marilyn Monroe was a resident of the state of New York." Defendants extrapolated from this that the BOE necessarily determined that Monroe was a New York domiciliary. The court noted, however, that residence and domicile are distinct concepts, and that there was no indication that domicile had been litigated in the BOE proceeding or decided by the board.

As respects the New York probate proceedings, defendants cited a statement in the report of the estate appraiser that Monroe "died a resident of the State of

New York on the 5th day of August 1962." Once again, because residence is not the same as domicile, the court found that this did not show that the court considered or weighed the factors usually relevant in determining domicile, or that it decided the question.

### c. Judicial Estoppel

 Finally, the court found that defendants had failed to show that MMLLC was judicially estopped from contending that Monroe was domiciled in California at the time of her death. Courts uniformly recognize that the purpose of the judicial estoppel doctrine is to protect the integrity of the judicial process by prohibiting parties from changing positions as circumstances warrant. *New Hampshire v. Maine*, 532 U.S. 742, 749, 121 S.Ct. 1808, 149 L.Ed.2d 968 (2001) (citations omitted). Judicial estoppel can be invoked whether a party takes inconsistent positions in the same action or in two different actions. See *Rissetto v. Plumbers and Steamfitters Local 343*, 94 F.3d 597, 605 (9th Cir.1996) ("We now make it explicit that the doctrine of judicial estoppel is not confined to inconsistent positions taken in the same litigation").

Defendants cited several purportedly inconsistent positions that they contended estopped MMLLC from asserting that Monroe was domiciled in California. Among these were statements made to the Surrogate's Court by Aaron Frosch, the executor of Monroe's estate, and Anna Strasberg, the administratrix of Monroe's will, that Monroe was a resident of New York at the time of her death. Noting that residence is distinct from domicile,

and that a person may reside somewhere other than her domicile, the court concluded that none of the statements addressed Monroe's domicile at death.[10] Because assertions that Monroe was a resident of New York were not "clearly inconsistent" with a contention that she was a domiciliary of California, the court found that the statements did not judicially estop MMLLC from asserting now that Monroe was domiciled in California. See *New Hampshire*, 532 U.S. at 751, 121 S.Ct. 1808; *Holder v. Holder*, 305 F.3d 854, 872 (9th Cir.2002) (declining to apply judicial estoppel and noting that "Jeremiah's position that California had jurisdiction over his custody claim is not necessarily inconsistent with his position that Washington, not California, has jurisdiction over his [International Child Abduction Remedies Act ("ICARA")] claim, because the concept of 'home state' under California state law differs from the concept of 'habitual residence' under ICARA").

Defendants also argued that a statement by Frosch that the estate did not have an exclusive right to Monroe's image judicially estopped plaintiffs from contending otherwise. Frosch made this statement in a 1972 affidavit filed in the Surrogate's Court. The affidavit concerned a dispute regarding transparencies of photographs taken of Monroe by Tom Kelley; the photographs were in Monroe's possession at the time of her death. When Kelley sought to have the photographs returned, Lee Strasberg, the beneficiary of Monroe's personal effects, argued that he was entitled them. Frosch distinguished between the transparencies themselves, and the

10. See, e.g., *United States v. Venturella*, 391 F.3d 120, 125 (2d Cir.2004) (" 'Residency means an established abode, for personal or business reasons, permanent for a time. A resident is so determined from the physical fact of that person's living in a particular place. One may have more than one resi-

dence in different parts of this country or the world, but a person may have only one domicile. A person may be a resident of one locality, but be domiciled in another,' " quoting *Rosario v. INS*, 962 F.2d 220, 224 (2d Cir.1992)).

right to reproduce the photographs. Regarding the latter, he opined that Monroe's "Estate [had] no exclusive right to her image" and could not "retain the photographs." In a subsequent affidavit, Frosch stated that a "question remained [regarding the identity of] ... the owner of rights" to the photographs he suggested that *"if* they were owned by [Monroe] at the time of her death, the Estate would be [the] Owner." After reviewing these statements, the court found that Frosch had not taken a firm position regarding the estate's ownership of reproduction or other rights in the photographs; it noted that the issue before the Surrogate's Court appeared to have been ownership of the physical transparencies, not ownership of rights to Monroe's image and likeness. Additionally, the court observed, there was no evidence that the Surrogate's Court ever ruled on the estate's ownership of reproduction or other rights in Monroe's image. Consequently, to the extent Frosch advanced a position, it stated, the record did not support a finding that he did so successfully.

Defendants next contended that plaintiffs were judicially estopped from asserting that Monroe was domiciled in California at the time of her death based on statements Frosch made to the BOE. The issue in the BOE appeal was whether Monroe's estate was required to pay California income tax on her earnings from films in which she appeared ("percentage payments"). Frosch asserted that the percentage payments were not taxable in California, but was denied a tax clearance certificate. California taxes "the entire taxable income of every nonresident which is derived from sources within [the] state," and the BOE classified the earnings as "personal services income," whose source was the place where the services were performed.

The estate made several unsuccessful arguments to the BOE in an effort to avoid imposition of the tax. Among these was an assertion that the percentage payments were not taxable in California because they did not derive from California sources. The estate argued that the income was earned in New York because it derived from *the estate's* ownership of "an intangible contract right whose situs, under the doctrine of *mobilia sequunter personam,* was the state" of *the Estate's* domicile or residence. "[U]nder the *mobilia* rule[, it noted,] the source of the income was in appellant's domiciliary state, New York." The BOE rejected this argument because no authority suggested that a contract right to receive percentage payments for personal services was an intangible subject to this doctrine. Rather, the Board concluded, the estate stood in the shoes of the decedent. Because Monroe performed the services in California, it stated, income from them was taxable in California.

As with defendants' other arguments, the court determined that the estate's argument to the BOE did not judicially estop plaintiffs from asserting that Monroe was a California domiciliary at the time of her death. First, the court noted, the estate's position that *it* was a New York domiciliary was not inconsistent with plaintiffs' present position that Monroe was domiciled in California when she died. Additionally, it observed, there was no evidence that the estate made any argument respecting Monroe's domicile at the time of her death. Indeed, as the BOE noted, "[d]uring her lifetime Miss Monroe owned the same contract right [to receive the percentage payments], and [the estate] does not contend that the *mobilia* rule would have applied to her receipt of the income."

Finally, the court noted, the BOE rejected the estate's argument. Consequently,

defendants could not show that the estate prevailed on an argument in the BOE proceeding that was contrary to the argument its purported privy asserted in this action. See *New Hampshire,* 532 U.S. at 749, 121 S.Ct. 1808. Consequently, the court concluded, there was no risk that judicial acceptance of plaintiffs' present position would create the perception that either the BOE or this court had been misled. See *id.* at 751, 121 S.Ct. 1808. As a result, the court found that defendants had not shown plaintiffs were judicially estopped from arguing that Monroe was a California domiciliary at death.

### C. Defendants' Motion for Reconsideration

On February 5, 2008, defendants filed a motion for reconsideration of those portions of the January 7, 2008 order that addressed collateral and judicial estoppel. Defendants contend that reconsideration is appropriate because newly discovered evidence shows that plaintiffs' privies took positions in prior proceedings that are directly contrary to plaintiffs' argument in this action that Monroe was a California domiciliary at the time of her death.[11]

## II. DISCUSSION

### A. Legal Standard Governing Motion for Reconsideration Under Local Rule 7–18

In this district, motions for reconsideration are governed by Local Rule 7–18, which states:

"A motion for reconsideration of the decision on any motion may be made only on the grounds of (a) a material difference in fact or law from that presented to the Court before such decision that in the exercise of reasonable diligence could not have been known to the party moving for reconsideration at the time of such decision, or (b) the emergence of new material facts or a change of law occurring after the time of such decision, or (c) a manifest showing of a failure to consider material facts presented to the Court before such decision." CA CD L.R. 7–18.

Rule 7–18 states that "[n]o motion for reconsideration shall in any matter repeat any oral or written argument made in support of or in opposition to the original motion." *Id.;* see also *School Dist. No. 1J, Multnomah County v. ACandS, Inc.,* 5 F.3d 1255, 1263 (9th Cir.1993) (reconsideration is appropriate if the movant demonstrates clear error, manifest injustice, newly discovered evidence, or an intervening change in controlling law). Whether to grant a motion for reconsideration under Local Rule 7–18 is a matter within the court's discretion. *Navajo Nation v. Confederated Tribes and Bands of the Yakama Indian Nation,* 331 F.3d 1041, 1046 (9th Cir.2003).

### B. Whether the Court Should Consider the Evidence Adduced by Defendants

In support of their motion for reconsideration, defendants proffer additional evidence they contend shows that plaintiffs should be judicially and collaterally estopped from asserting that Monroe was a California domiciliary at the time of her death. Defendants acknowledge that they have been in possession of this documentation since it was produced to them by plaintiffs in December 2006.[12] They repre-

---

**11.** Defendants The Milton H. Greene Archives, Inc. and Tom Kelley Studios, Inc.'s Memorandum of Points and Authorities in Support of Motion for Reconsideration of Order Finding No Judicial and Collateral Estoppel as to Domicile of Marilyn Monroe ("Def.'s Mem.") at 2.

**12.** Def.'s Mem. at 2.

sent, however, that they did not receive it until the Greene/Kelley motions for summary judgment were fully briefed,[13] and that they were unable to discover and present it to the court previously because it was "buried in the more than 58,000 documents [that plaintiffs] produced" after briefing was complete.[14]

The court does not condone defendants' delay in presenting this evidence to the court. It accepts their explanation, however, that plaintiffs produced a large volume of documents in response to requests for production after the motions for summary judgment were fully briefed. Given the basis upon which the court initially granted summary judgment, defendants had no incentive immediately to comb through the voluminous materials produced to uncover evidence relevant to judicial or collateral estoppel. When the court reconsidered and reversed its decision regarding MMLLC's standing to assert right of publicity claims, moreover, it reviewed the questions of judicial and collateral estoppel on the basis of the existing record—i.e., the record prior to the date plaintiffs produced documents to defendants. Defendants were not given an opportunity to supplement the record before that decision was made. The court determined on the record before it that defendants' judicial and collateral estoppel arguments lacked merit. It did not, however, preclude defendants from raising the defenses in the future.

 Under these circumstances, the court exercises its discretion to consider the newly presented evidence. Although the need for reconsideration is partially a product of the fact that defendants filed a premature motion for summary judgment, the court concludes it is appropriate to review the evidence they have now adduced because the doctrine of judicial estoppel concerns protection of the integrity of the courts and the judicial process. See *Wagner v. Professional Engineers in California Government*, 354 F.3d 1036, 1044 (9th Cir.2004) ("Judicial estoppel is an equitable doctrine that is intended to protect the integrity of the judicial process by preventing a litigant from 'playing fast and loose with the courts,'" quoting *Russell v. Rolfs*, 893 F.2d 1033, 1037 (9th Cir.1990)).

## C. Whether the Court Should Reconsider its Order Regarding Judicial Estoppel

### 1. Standard Governing Motions for Summary Judgment

A motion for summary judgment must be granted when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." FED. R.CIV.PROC. 56(c). A party seeking summary judgment bears the initial burden of informing the court of the basis for its motion and of identifying those portions of the pleadings and discovery responses that demonstrate the absence of a genuine issue of material fact. See *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Where the moving party will have the burden of proof on an issue at trial, the movant must affirmatively demonstrate that no reasonable trier of fact could find other than for the moving party. On an issue as to which the nonmoving party will have the burden of proof, however, the movant can prevail merely by pointing out that there is an absence of evidence to support the nonmoving party's case. See *id.* If the moving party meets its initial burden, the nonmoving party must set forth, by affidavit or as otherwise provided

---

13. *Id.*

14. *Id.*

in Rule 56, "specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); FED.R.CIV.PROC. 56(e)(2).

Evidence presented by the parties at the summary judgment stage must be admissible. FED.R.CIV.PROC. 56(e)(1). In reviewing the record, the court does not make credibility determinations or weigh conflicting evidence. Rather, it draws all inferences in the light most favorable to the nonmoving party. See *T.W. Electrical Service, Inc. v. Pacific Electrical Contractors Ass'n,* 809 F.2d 626, 630–31 (9th Cir. 1987). Conclusory, speculative testimony in affidavits and moving papers is insufficient to raise genuine issues of fact and defeat summary judgment. See *Falls Riverway Realty, Inc. v. Niagara Falls,* 754 F.2d 49, 56 (2d Cir.1985); *Thornhill Pub. Co., Inc. v. GTE Corp.,* 594 F.2d 730, 738 (9th Cir.1979).

### 2. Standard Governing Judicial Estoppel

 As noted in the January 7, 2008 order, judicial estoppel " 'generally prevents a party from prevailing in one phase of a case on an argument and then relying on a contradictory argument to prevail in another phase.' " *New Hampshire,* 532 U.S. at 749, 121 S.Ct. 1808 (citations omitted). "[F]ederal law governs the application of judicial estoppel in federal court." *Rissetto,* 94 F.3d at 603. The doctrine applies to positions taken in the same action or in different actions. See *id.* at 605 ("We now make it explicit that the doctrine of judicial estoppel is not confined to inconsistent positions taken in the same litigation"). It also "applies to a party's stated position whether it is an expression of intention, a statement of fact, or a legal assertion." *Wagner,* 354 F.3d at 1044 (citing *Helfand v. Gerson,* 105 F.3d 530, 535 (9th Cir.1997)).

 Factors relevant in deciding whether to apply the doctrine include: (1) whether the party's later position is "clearly inconsistent" with its earlier position; (2) whether the party has successfully advanced the earlier position, such that judicial acceptance of an inconsistent position in the later proceeding would create a perception that either the first or the second court had been misled; and (3) "whether the party seeking to assert an inconsistent position would derive an unfair advantage or impose an unfair detriment on the opposing party if not estopped." *New Hampshire,* 532 U.S. at 751, 121 S.Ct. 1808 (citations omitted).

 In addition to these factors, the Ninth Circuit examines "whether the party to be estopped acted inadvertently or with any degree of intent." *EaglePicher Inc. v. Federal Ins. Co.,* CV 04–870 PHX MHM, 2007 WL 2265659, *3 (D.Ariz. Aug.6, 2007) (citing *Johnson v. Oregon Dep't of Human Resources Rehab. Div.,* 141 F.3d 1361, 1369 (9th Cir.1998)); see also *Prach v. Bowen Property Mgmt.,* CV 03–250 EFS, 2007 WL 397453, *4 (E.D.Wash. Feb.1, 2007) ("Although Defendants cite authority that litigants should be bound by the actions of their attorneys, the inquiry is not whether Plaintiff Kriger is 'bound' by the mistakes in the original schedules, but rather whether the Plaintiff Kriger (along with his counsel) acted intentionally, as opposed to inadvertently"). "Judicial estoppel applies when a party's position is 'tantamount to a knowing misrepresentation to or even fraud on the court.' " *Johnson,* 141 F.3d at 1369 (quoting *Ryan Operations G.P. v. Santiam–Midwest Lumber Co.,* 81 F.3d 355, 362–63 (3d Cir. 1996)). Thus, "[i]f incompatible positions are based not on chicanery, but only on inadvertence or mistake, judicial estoppel does not apply." *Id.* (citing *In re Corey,* 892 F.2d 829, 836 (9th Cir.1989)); see also

*Wyler Summit Partnership v. Turner Broadcasting Sys., Inc.,* 235 F.3d 1184, 1190 (9th Cir.2000) ("The doctrine of judicial estoppel requires, *inter alia,* a knowing antecedent misrepresentation by the person or party alleged to be estopped and prevents the party from tendering a contradictory assertion to a court," citing *Russell v. Rolfs,* 893 F.2d 1033, 1037 (9th Cir.1990)). "Thus, if a claimant's particular representations are so inconsistent that they amount to an affront to the court, judicial estoppel may apply." *Johnson,* 141 F.3d at 1369.

▬▬▬ A party may invoke the doctrine of judicial estoppel in a motion for summary judgment to bar a claim based on an inconsistent position. See *Elston v. Westport Ins. Co.,* 253 Fed.Appx. 697, 699 (9th Cir.2007) (Unpub.Disp.) (affirming the district court's grant of summary judgment against plaintiff on the basis that her claims were barred by judicial estoppel). A party seeking to defeat summary judgment on judicial estoppel grounds must "sufficiently explain" a prior judicial position that is inconsistent with an essential element of its claim. See, e.g., *Cleveland v. Policy Management Systems Corp.,* 526 U.S. 795, 806, 119 S.Ct. 1597, 143 L.Ed.2d 966 (1999) (stating that a party must "provide a sufficient explanation" for a prior inconsistent position to defeat summary judgment); *Fewer v. Copper & Brass Sales, Inc.,* 183 Fed.Appx. 696, 696 (9th Cir. June 9, 2006) (Unpub.Disp.) ("John J. Fewer appeals the district court's grant of summary judgment in favor of Copper & Brass Sales and Thyssen, Inc. ("C & B") on Fewer's claims of failure to accommodate, disability and age discrimination in violation of California's Fair Employment and Housing Act ('FEHA') and his claim of wrongful termination in violation of public policy.... Because Fewer failed to 'proffer a sufficient explanation' to the district

court for these inconsistent positions, the court did not abuse its discretion applying the doctrine of judicial estoppel," citing *Cleveland,* 526 U.S. at 806, 119 S.Ct. 1597); *Zurich Am. Ins. Co. v. Felipe Grimberg Fine Art,* Civ 04–763 RLE, 2008 WL 394808, *4 (S.D.N.Y. Feb.13, 2008) ("To survive a motion for summary judgment, ... individual must explain why his or her previous position or contention is consistent with his or her current position," citing *Mitchell v. Washingtonville Central School District,* 190 F.3d 1, 7 (2d Cir. 1999)); compare *Abercrombie & Fitch Co. v. Moose Creek, Inc.,* 486 F.3d 629, 634 (9th Cir.2007) (concluding that the evidence plaintiff presented distinguishing its position from the position it took in prior litigation "fail[ed] to rebut the determination of clear inconsistency" and thus "[t]he application of judicial estoppel ... was not an abuse of discretion"); *Committee of Russian Federation on Precious Metals and Gems v. United States,* 987 F.Supp. 1181, 1185 (N.D.Cal.1997) (denying summary judgment on judicial estoppel grounds in part because "this court neither finds that the IRS's position that the diamonds and valuables were fraudulently converted from the Committee has been adopted by the Tax Court at this time, nor that the IRS is 'playing fast and loose' with the judicial system").

### 3. New Evidence Presented by Defendants

Defendants argue that plaintiffs should be estopped from claiming that Monroe was a California domiciliary when she died due to, *inter alia,* statements made to the California Inheritance Tax Appraiser by Aaron Frosch, the executor of Monroe's estate, and by counsel for the estate.[15] Defendants proffer a March 4, 1966 letter to the appraiser from Gang, Tyre, Rudin &

---

15. *Id.* at 5.

Brown, a law firm that represented Monroe when she was alive and also served as counsel for the estate.[16] The letter enclosed an "Inheritance Tax Affidavit" concerning Monroe's estate,[17] as well as an "Affidavit Concerning Residence supported by affidavits from Ralph L. Roberts, Hattie Stephenson Amos, May Reis, and Patricia Newcomb." The letter stated that the latter items were being submitted "[s]ince Miss Monroe was a non-resident of the State of California at the time of her death ...,"[18] and observed: "Since the estate in California is clearly insolvent and the estate in New York is probably insolvent also, we trust you will be in a position to furnish a no tax certificate so that a petition may be filed for termination of the California proceedings in accordance with the requirements of law."[19]

The "Affidavit Concerning Residence," which was executed by Frosch,[20] was a form containing questions regarding Monroe's residence at the time of her death. In it, Frosch attested that Monroe was "a resident of the City of New York, County of New York, State of New York" when she died.[21] He stated that she filed her last income tax return prior to death in April 1962 in New York City, New York.[22] He also asserted that Monroe purchased "a home in Los Angeles to live at while engaged in performing services in a motion picture film."[23] He contended that, at the time of her death, Monroe was "[r]esiding temporarily in Los Angeles," and that she "had a fully furnished apartment in New York City, which was her permanent residence."[24] Frosch stated that in the five-year period immediately preceding her death, Monroe spent time in California "[o]nly for purpose of performing as an actress in Motion Picture Films and not for purpose of residing there[ ]."[25] Asked whether Monroe had engaged in business in California, Frosch responded affirmatively, noting that Monroe had engaged in business in the state since she was "temporarily in California performing services as a motion picture actress ... for approximately six months prior to death."[26]

Frosch contended that Monroe made declarations regarding her residence "on a number of occasions," that she stated she "was returning to New York after completing [her] motion picture commitment [and] that she considered [New York] her residence."[27] He represented that Monroe's actions showed that she viewed New York as her residence up to the time of her death, citing the fact that she "in all respects [retained] her New York residence. Said Residence was not sublet. It remained fully furnished and contained [Monroe's] personal effects, clothing, and substantially all of its contents. Furthermore, [Monroe's] maid continued to look after and maintain said residence and its

---

**16.** Declaration of Surjit P. Soni in Support of Defendants' Motion for Reconsideration ("Soni Decl."), ¶ 7, Exh. F.

**17.** *Id.,* Exh. F.

**18.** *Id.*

**19.** *Id.*

**20.** *Id.,* Exh. G. MMLLC objects to the contents of this and the other declarations on numerous grounds. (See Plaintiffs' Objections to Declaration of Surjit P. Soni Filed in Support of Motion for Reconsideration of Court's January 7, 2008 Order ("Pl.'s Objec-

tions") at 5–9.) The court addresses MMLLC's objections *infra.*

**21.** Soni Decl., Exh. G.

**22.** *Id.*

**23.** *Id.*

**24.** *Id.*

**25.** *Id.*

**26.** *Id.*

**27.** *Id.*

contents." [28] Frosch noted that Monroe had filed New York State Residence Income Tax returns for 1962 and prior years. [29]

The remaining declarations were similar. Ralph L. Roberts stated that he was a close personal friend of Monroe's, and that she "frequently told [him] that she considered her trips to California merely as visits for the purpose of appearing in various motion picture films and for the conduct of business interests in relation thereto." [30] Roberts asserted Monroe told him that she purchased a house in California "primarily for the reason that she disliked living in hotels and preferred both the comfort and privacy of a private home...." He also reported that, "[o]n frequent occasions, both in California and in New York, [Monroe] advised [him] that she considered her New York apartment as her permanent home and permanent residence." Finally, Roberts asserted that, shortly prior to her death, Monroe "specifically told [him] that she intended [to vacate] her California house and [that she] was going to return to her New York apartment which she considered her permanent home and residence and [was going] to reside permanently thereat." [31]

Hattie Stephenson, Monroe's personal housekeeper for approximately four years prior to her death, declared that she was required to clean and maintain Monroe's New York apartment as part of her job duties. [32] She stated that in September 1961, Monroe departed her New York apartment and went to California temporarily to appear in a movie, but instructed Stephenson to be at her New York apartment every day, cleaning and performing the same functions that she did when Monroe was in residence. [33] Stephenson asserted that when Monroe traveled to California, she left all of her furniture and furnishings at the New York apartment, as well as a substantial portion of her clothes, treasured possessions, and personal effects. [34] Stephenson contended that Monroe told her on several occasions that she considered the New York apartment "her permanent residence." [35] She asserted that two days prior to Monroe's death, Monroe "requested that I proceed to her California house to stay with her for approximately one month and then that I return to New York with [Monroe]. I was ... told that [Monroe] intended to return to her permanent residence in New York City." [36]

In her declaration, May Reis, who was employed as Monroe's private secretary from February 1958 to September 1961, stated that Monroe "maintained her permanent residence in her New York apartment except for such occasions when she was required to be away from New York for business purposes." [37] Reis explained that it was Monroe's custom to "temporarily depart from her New York apartment approximately two to three weeks prior to the commencement of [a] motion picture film[,]" which time she "generally utilized for various pre-production consultations, make-up tests, wardrobe preparations, etc. Generally she would remain away from her New York residence until after the completion of the film and any consultations thereafter required. She would then re-

28. *Id.*

29. *Id.*

30. *Id., Exh.* H.

31. *Id.*

32. *Id., Exh.* I.

33. *Id.*

34. *Id.*

35. *Id.*

36. *Id.*

37. *Id., Exh.* J.

turn to her permanent residence in New York."[38] Reis asserted that it was "always [her] understanding that subsequent to [Monroe's divorce from Arthur Miller in January 1961] and while [she] was employed by [Monroe, Monroe] considered her said New York apartment as her official and permanent residence."[39]

Patricia Newcomb, Monroe's "Public Relations Counsel" and close personal friend, made similar statements. She declared that Monroe "always conveyed the impression to [Newcomb] that she considered her … apartment … in New York City as her permanent residence."[40] Despite the fact that Monroe traveled extensively and was occasionally away from New York on business matters for prolonged periods of time, Newcomb asserted, "she always returned to her permanent New York City residence."[41] Newcomb reported that Monroe had told her she purchased a house in Los Angeles solely because she disliked living in hotels, and "that she had no intention of making her permanent residence in her … California house, but intended [to] leav[e] California and return[ ] to her New York residence upon the completion of her assignment" in California.[42] Newcomb stated that, based on her "close association with [Monroe]," she believed Monroe "considered New York as her permanent residence and … intended to return to her permanent New York residence apartment after the completion of her business activities in California."[43]

On April 5, 1967, the inheritance tax appraiser filed his report with the superior court in Los Angeles.[44] He stated that "after due and regular hearing and appraisement made," he had concluded that Monroe "died a resident of the County of New York, State of New York, and left property taxable under the inheritance tax laws of the State of California."[45] The report determined that the California tax on estate property was $777.63.[46]

Defendants argue that the declarations submitted to the inheritance tax appraiser regarding Monroe's "permanent residence" were in fact arguments regarding her domicile.[47] They contend that the tax appraiser accepted the arguments and concluded that Monroe was a New York resident at the time of her death. As a result, they maintain, the estate successfully avoided California taxes on the bulk of Monroe's estate.[48] Given the favorable tax treatment that estate beneficiaries received as a result of these representations, defendants maintain that plaintiffs will gain an unfair benefit if they are allowed to maintain inconsistently in this litigation that Monroe was a California domiciliary when she died.[49]

### 4. Whether the Alleged Inconsistent Statements Were Made By the Same Party

To determine whether plaintiffs are judicially estopped by statements to the California inheritance tax appraiser made on

---

38. *Id.*

39. *Id.*

40. *Id.,* Exh. K.

41. *Id.*

42. *Id.*

43. *Id.*

44. *Id.,* Exh. N.

45. *Id.*

46. *Id.*

47. Def.'s Mem. at 5–7.

48. Defendants' Reply Memorandum of Points and Authorities in Support of Motion for Reconsideration ("Def.'s Reply") at 8.

49. *Id.* at 14.

behalf of Monroe's estate, the court must first examine whether plaintiffs are in privity with Frosch, such that they may be deemed the "same party" as that which participated in the tax proceeding. See *Maitland v. Univ. of Minnesota*, 43 F.3d 357, 363–64 (8th Cir.1994) (under the doctrines of collateral estoppel, equitable estoppel, promissory estoppel, and judicial estoppel, "the party who is to be estopped, *or one in privity with that party*, must have asserted a fact or claim, or made a promise, that another party relied on, that a court relied on, or that a court adjudicated" (emphasis added) (citations omitted)). Privity permits "a non-party to an action ... [to] be bound by the issues decided there if it substantially controls, or is represented by, a party to the action." *United States v. Bonilla Romero*, 836 F.2d 39, 43 (1 st Cir.1987) (citing RESTATEMENT (SECOND) OF JUDGMENTS §§ 39, 41 (1982); *Montana v. United States*, 440 U.S. 147, 154, 99 S.Ct. 970, 59 L.Ed.2d 210 (1979); *Chicago, R.I. & P. Ry. Co. v. Schendel*, 270 U.S. 611, 618–19, 46 S.Ct. 420, 70 L.Ed. 757 (1926); and *Mother's Restaurant, Inc. v. Mama's Pizza, Inc.*, 723 F.2d 1566, 1572 (Fed.Cir.1983)). "The party estopped due to representation by a party to the action must have been 'so closely related to the interest of the party to be fairly considered to have had his day in court.'" *Id.* (quoting *In re Gottheiner*, 703 F.2d 1136 (9th Cir.1983)); see also *EEOC v. United States Steel Corp.*, 921 F.2d 489, 493 (3d Cir.1990) ("One relationship long held to fall within the concept of privity is that between a nonparty and party who acts as the nonparty's representative.... If the representative party litigates first, subsequent litigation involving persons on whose behalf the representative appeared may be precluded," citing *Martin v. Wilks*, 490 U.S. 755, 762 n. 2, 109 S.Ct. 2180, 104 L.Ed.2d 835 (1989), and RESTATEMENT (SECOND) OF JUDGMENTS § 41 (1980)). For privity to exist, "[t]here must be a 'substantial

identity' of the parties such that the party to the action was the virtual representative of the party estopped." *Bonilla Romero*, 836 F.2d at 43 (citing *Chicago, R.I. & P. Ry. Co.*, 270 U.S. at 621, 46 S.Ct. 420; *Pan American Match Inc. v. Sears, Roebuck and Co.*, 454 F.2d 871 (1st Cir.1972)). "Whether a party is virtually representative of a non-party is a question of fact determined on a case-by-case basis." *Id.* (citing *United States v. ITT Rayonier, Inc.*, 627 F.2d 996, 1003 (9th Cir.1980); and *Aerojet–General Corp. v. Askew*, 511 F.2d 710, 719 (5th Cir.1975), cert. denied, 423 U.S. 908, 96 S.Ct. 210, 46 L.Ed.2d 137, reh'g denied, 423 U.S. 1026, 96 S.Ct. 470, 46 L.Ed.2d 400 (1975)).

### a. Whether There is Privity Between an Executor of an Estate and the Estate's Beneficiaries

Plaintiffs do not deny that they are the ultimate beneficiaries of the Monroe estate. As noted in the court's January 7, 2008 order, the residual clause of Monroe's will stated:

"SIXTH: All the rest, residue and remainder of my estate, both real and personal, of whatsoever nature and wheresoever situate, of which I shall die seized or possessed or to which I shall be in any way entitled, or over which I shall possess any power of appointment by Will at the time of my death, including any lapsed legacies, I give, devise and bequeath as follows:

(a) To MAY REIS the sum of $40,000.00 or 25% of the total remainder of my estate, whichever shall be the lesser.

(b) To DR. MARIANNE KRIS 25 % of the balance thereof, to be used by her as set forth in ARTICLE FIFTH (d) of this my Last Will and Testament.

(c) To LEE STRASBERG the entire remaining balance."

Lee Strasberg was a residuary beneficiary under Monroe's will. MMLLC argues

that when Strasberg died, his property passed by will to his wife, Anna Strasberg. In 2001, Ms. Strasberg formed MMLLC, and she and the holder of a 25% interest in the residue of Monroe's estate transferred their rights and interest in Monroe's estate to MMLLC.

Plaintiffs argue, however, that they should not be estopped by the statements made by the estate's executor in the California tax proceedings because "there is generally no privity between an estate's executor and its beneficiaries."[50] To determine whether the executor of Monroe's estate was in privity with her beneficiaries for purposes of judicial estoppel, the court looks to federal law. See *Rissetto*, 94 F.3d at 603. In *Chicago, Rock Island & Pacific Railway Co. v. Schendel*, 270 U.S. 611, 46

**50.** Plaintiffs' Opposition to Motion for Reconsideration of Court's January 7, 2008 Order ("Pl.'s Opp.") at 18. As plaintiffs note, "federal law governs the application of judicial estoppel in federal court." (Pl.'s Opp. at 18 n. 3 (citing *Rissetto*, 94 F.3d at 603)). In support of their contention that there is no privity between the executor and beneficiaries of an estate, plaintiffs cite two cases and a secondary source. In *Fouke v. Schenewerk*, 197 F.2d 234, 235 (5th Cir.1952), plaintiffs sought a to recover the surface and mineral rights to a tract of land in Texas, which had been deeded to third parties by the executrix and trustee of two testators. Several defendants, who were citizens of Texas, as were plaintiffs, were dismissed from the action in order to maintain diversity jurisdiction. *Id.* at 236. The court determined that those defendants, who were the children or devisees of the testators, were indispensable parties to the action. It stated that nothing in the record showed that the executrix and trustee represented the interests of the testators' children, and that the children were therefore not estopped to prove the facts about the ownership of the land. *Id.* The court noted that "[e]stoppel applies only to those in privity. Donor and donee are in privity of estate, as are a lessor and lessee; an heir is in privity with his ancestor; an executor is in privity with his testator; a trustee is in privity with his trustor; but there is not necessarily [any] privity of estate or by blood between heirs and trustees or executors." *Id.*

Plaintiffs also rely on *Matter of Herm's Estate*, 284 N.W.2d 191, 193 (Iowa 1979). There, a temporary administrator of a testatrix's estate sought to set aside a deed and nullify numerous inter vivos transfers of assets by the testatrix to her nephew. Following a trial, a decree was entered voiding the deed and transfers. *Id.* at 194. The nephew appealed, arguing that the administrator's claim was barred by the "clean hands" doctrine. The nephew asserted that the administrator was in privity with the testatrix's nieces, who were the parties who would directly benefit from voiding the transfers at issue. The doctrine of clean hands applied, he asserted, because purportedly, the nieces had improperly removed furnishings from the testatrix's home. *Id.* at 196. The court declined to apply the "clean hands" doctrine because it found there was no privity between the administrator and the nieces. It noted that "[a]n executor or administrator is an officer of the court. Such officer is not an agent of the heirs or beneficiaries: He or she does not derive his or her powers from them and is not subject to their control. It follows that the relation of privity ordinarily does not exist between an administrator and the distributees from an estate; hence, there can be no estoppel of an administrator by any action or non-action of a distributee." *Id.* (citations omitted).

Plaintiffs' final authority—American Jurisprudence 2d Estoppel & Waiver § 137—states that "[w]hile generally the relation of privity does not exist between an administrator and the distributees of an estate, and therefore there can ordinarily be no estoppel of an administrator by any action or nonaction of a distributee, the factual situation may call for an exception." 28 AM.JUR.2D Estoppel & Waiver § 137 (2007) (citing *Matter of Herm's Estate*, 284 N.W.2d 191; and *Broom's Adm'r v. National Auto Sales*, 246 S.W.2d 1008, 1011 (Ky.1952) (holding that an administrator was estopped from maintaining an action to recover a decedent's vehicle that was fraudulently sold because the beneficiaries knew of the fraud and did nothing to prevent it, and "[i]n a situation like the present, the beneficiaries of the estate are the real parties in interest and the only parties in interest. The administrator is but their agent and would be but a mere conduit through which the recovery would flow to them")).

S.Ct. 420, 70 L.Ed. 757 (1926), the United States Supreme Court considered whether a judgment against the beneficiary of an estate was binding in another proceeding brought by the administrator of the estate on behalf of the beneficiary. The two actions arose out of an accident on the line of a railway company in which one employee died. *Id.* at 612, 46 S.Ct. 420. The first proceeding was initiated by the administrator of the estate for the sole benefit of the surviving widow in Minnesota district court under the federal Employers' Liability Law. *Id.* at 614, 46 S.Ct. 420. The second was an administrative proceeding initiated by the railway company under the Iowa Workmen's Compensation Act; the widow was made a party to this action as sole beneficiary under the act. *Id.* The dispositive issue in both cases was whether the deceased had been engaged in interstate or intrastate commerce. Although the administrative proceeding was the second filed, the arbitration panel in that proceeding ruled first, finding that the decedent had been engaged in intrastate commerce. As a result, the widow was awarded benefits; this award was subsequently confirmed in the Iowa courts. *Id.*

The railway company introduced the final Iowa judgment in proceedings before the Minnesota court and argued that it was res judicata on the issue of the interstate or intrastate nature of the decedent's activities. The district court agreed. *Id.* at 615, 46 S.Ct. 420. This ruling was later reversed by the Minnesota Supreme Court, based, in part, on "lack of identity of parties, since under the Iowa statute the right of recovery is in the beneficiary while under the federal act the right is in the personal representative." *Id.*

The Supreme Court, in turn, reversed the Minnesota Supreme Court, holding that the administrator and the widow, as beneficiary of the estate, were in privity. The Court noted that "it [was] the right of the widow, and of no one else, which was presented and adjudicated in both courts." *Id.* at 618, 46 S.Ct. 420. This was confirmed by the fact that under the Employers' Liability Law, the administrator was given statutory authority to sue only "in the right and for the sole benefit of the widow." As a result, the Court observed, the widow would have been bound by any decision obtained by the administrator "in accordance with the general rule that 'whenever an action may properly be maintained or defended by a trustee in his representative capacity without joining the beneficiary, the latter is necessarily bound by the judgment.'" *Id.* at 620, 46 S.Ct. 420 (quoting 1 FREEMAN ON JUDGMENTS (5th Ed.) § 500). The Court also cautioned generally that "[i]Identity of parties is not a mere matter of form, but of substance. Parties nominally the same may be, in legal effect, different; and parties nominally different may be, in legal effect, the same." *Id.* (citing BIGELOW ON ESTOPPEL (6th Ed.) 145); *Calhoun's Lessee v. Dunning,* 4 Dall. 120, 121, 4 U.S. 120, 1 L.Ed. 767 (1792); *Follansbee v. Walker,* 74 Pa. 306, 309 (1873); and *In re Estate of Parks,* 166 Iowa 403, 147 N.W. 850 (Iowa 1914).

Applying these principles, the Court held that

"[i]f a judgment in the Minnesota action in favor of the administrator had been first rendered, it does not admit of doubt that it would have been conclusive against the right of the widow to recover under the Iowa compensation law. And it follows, as a necessary corollary, that the Iowa judgment, being first, is equally conclusive against the administrator in the Minnesota action; for if, in legal contemplation, there is identity of parties in the one situation, there must be like identity in the other." *Id.* at 618, 46 S.Ct. 420.

Consequently, the Court held, the Iowa judgment had res judicata effect in the Minnesota action. *Id.* at 623, 46 S.Ct. 420.

Federal courts have frequently cited *Chicago, Rock Island & Pacific Railway Co.* in holding that a "beneficiary is bound by a judgment properly maintained or defended" by an executor, administrator, or trustee. See, e.g., *Davies v. Guinn Resources Co.*, 978 F.2d 714, 1992 WL 317249, *4 (9th Cir. Oct.29, 1992) (Unpub.Disp.) ("Beneficiaries of a trust are bound by a judgment against their trustee in her capacity as trustee," citing *Chicago, Rock Island & Pac. Ry.*, 270 U.S. at 620, 46 S.Ct. 420); *Pollard v. Cockrell*, 578 F.2d 1002, 1008–09 (5th Cir.1978) ("Virtual representation demands the existence of an express or implied legal relationship in which parties to the first suit are accountable to non-parties who file a subsequent suit raising identical issues. In reviewing cases decided under the doctrine, we have described the types of relationships contemplated: 'estate beneficiaries bound by administrators, presidents and sole stockholders by their companies, parent corporations by their subsidiaries, and a trust beneficiary by the trustee," citing *Southwest Airlines Co. v. Texas Int'l Airlines*, 546 F.2d 84, 97 (5th Cir.1977)); *Southwest Airlines Co.*, 546 F.2d at 97 ("In *Aerojet[-General Corp. v. Askew*, 511 F.2d 710 (5th Cir.1975),] most of the cases cited represent factual settings with little relevance to the Southwest dispute because they involved only private parties: estate beneficiaries bound by administrators, presidents and sole stockholders by their companies, parent corporations by their subsidiaries, and a trust beneficiary by the trustee," citing *Chicago, Rock Is-*

*land & Pac. Ry.*, 270 U.S. 611, 46 S.Ct. 420, for proposition that estate beneficiaries are bound by administrators);[51] *Meador v. Oryx Energy Co.*, 87 F.Supp.2d 658, 665 (E.D.Tex.2000) ("[I]f both Plaintiff and the Robbins plaintiffs are in privity with their common ancestor for a claim belonging to that ancestor, it follows that they are also in privity with each other regarding such a claim. Further support for this conclusion is found in *Chicago, R.I. & P. Ry. Co. v. Schendel*, where the U.S. Supreme Court held that an estate (represented by its administrator) and beneficiaries of that estate are in privity sufficient to constitute identity of parties. . . . Therefore, it seems apparent that Plaintiff, the Robbins plaintiffs, and all other alleged beneficiaries of James Meaders' estate should be regarded as in privity with the estate and with each other regarding claims of that estate that have been filed by purported representatives of that estate," also citing *Pollard*, 578 F.2d at 1008–09); *United States v. Schnick*, 66 B.R. 491, 494 (W.D.Mo.1986) ("In *Pollard v. Cockrell*, 578 F.2d 1002 (5th Cir.1978), the court provides examples of the types of relationships encompassed within the virtual representation doctrine: (1) presidents and sole stockholders are in sufficient privity to be deemed adequately represented by their companies; (2) parent corporations are virtually represented by their subsidiaries; (3) trust beneficiaries are adequately represented by the trustee of the trust; and (4) estate beneficiaries are bound by actions brought by the administrator").

 Other federal courts have reached the same conclusion without citing *Chicago, Rock Island & Pacific Railway Co.*

---

**51.** As plaintiffs note, the Fifth Circuit held in *Fouke v. Schenewerk*, 197 F.2d at 236, that "there is not necessarily [any] privity of estate or by blood between heirs and trustees or executors." Although the court's use of the conditional "not necessarily" suggests that it was not articulating a categorical rule, to the extent it had any such intent, the Fifth Circuit decisions in *Southwest Airlines Co.* and *Pollard* clearly reject the rule.

See, e.g., *Pelfresne v. Village of Williams Bay*, 865 F.2d 877, 881 (7th Cir.1989) ("As noted, the Village claims that Eley and Koch, who were defendants in the state nuisance suit, held the property as trustees for a trust of which Pelfresne was a beneficiary. If this is true, Pelfresne's current action would clearly be barred—a trust beneficiary is collaterally estopped by a previous adjudication for or against a trustee, so long as the trustee and beneficiary did not have adverse interests in the conduct of the prior litigation and the trustee was authorized to prosecute and defend litigation on behalf of the trust" (citations omitted)); *Bender v. City of Rochester*, 765 F.2d 7, 12 (2d Cir.1985) ("The administrator of a decedent's estate is in privity both with the decedent and with the decedent's beneficiaries," citing 1B MOORE'S FEDERAL PRACTICE ¶ 0.411[12] (1984)); *McCrocklin v. Fowler*, 285 F.Supp. 41, 43 (E.D.Wis.1968) ("[T]he Board, as beneficiary of the estate of Caroline Durkee, is in privity with, and is bound by the acts of Mr. Foulkes, the administrator. Likewise, Mr. McCrocklin, as an assignee, is in privity with the Board," (citing 1B MOORE'S FEDERAL PRACTICE, 2d Ed., p. 1665)); *Conney v. Erickson*, 251 F.Supp. 986, 990 (W.D.Wis.1965) ("It is true that there is privity between the administrator of an estate and a beneficiary of an estate in certain situations"). As a matter of federal law, therefore, estate beneficiaries are in privity with the estate's administrator or executor.

Federal cases discussing privity between beneficiaries and executors, administrators, or trustees often refer to state law. See, e.g., *Carter v. City of Emporia*, 815 F.2d 617, 620 (10th Cir.1987) ("Kansas follows the general rule that 'a judgment binds not only the parties to the action but also those who are in privity with them,' and under Kansas law an administrator of an estate is sufficiently in privity with heirs or beneficiaries of an estate to be subject to principles of claim preclusion," citing *Wells v. Ross*, 204 Kan. 676, 680, 465 P.2d 966 (1970)). Thus, although privity or the lack thereof is a matter of federal law, the law of California and New York is nonetheless instructive because that is whether the tax and estate proceedings at issue took place. The duties and responsibilities of an executor or administrator are most often governed by statutes and/or cases in the state where a will is being probated. To confirm its conclusion that federal law treats the executor and beneficiaries of an estate as privies, therefore, the court looks to the law of the two states where Monroe's will was probated—California and New York.

Contrary to the two cases cited by plaintiffs, California courts have determined that executors and administrators are, indeed, in privity with beneficiaries. In *Luckhardt v. Mooradian*, 92 Cal.App.2d 501, 207 P.2d 579 (1949), for example, the administratrix of an estate filed claims with the American Mexican Claims Commission regarding land expropriated by the government of Mexico. *Id.* at 507, 207 P.2d 579. The estate that the administratrix represented was adjudged not to be the owner of the land. *Id.* at 504, 207 P.2d 579. Heirs of the testator filed a separate lawsuit claiming an interest in the land; their claims were rejected by the California Court of Appeal. The court noted first that "[t]he administratrix and the heirs [were] in privity." *Id.* at 519, 207 P.2d 579 (citing 11B CAL.JUR. § 836). It then held that "[a] judgment entered in an action in which an administratrix of an estate of a deceased person is a party, is binding not only upon the administratrix but also upon the heirs of the deceased person, even though the heirs have not been made parties to the action. The rule in this state is that the judgment concludes not only the adverse party but also all those claiming under the title he represents." *Id.* (citations omitted).

Likewise, in *Bernhard v. Bank of America National Trust & Savings Association*, 19 Cal.2d 807, 122 P.2d 892 (1942), the California Supreme Court determined that defendant could assert a res judicata defense against plaintiff by virtue of plaintiff's position as administratrix of an estate. In an earlier case, plaintiff Bernhard, a beneficiary under a testatrix's will, filed objections to the executor's account because it omitted the fact that the executor had transferred funds from the decedent's bank account to his own account. *Id.* at 809, 122 P.2d 892. The court settled the account and declared that the amount transferred to the executor had been a gift from the decedent. *Id.* at 809–10, 122 P.2d 892. After the executor was discharged, plaintiff was appointed administratrix of the will. *Id.* at 810, 122 P.2d 892. She then instituted an action against the bank where the decedent's money had been on deposit, seeking to recover the funds transferred to the executor on the ground that the decedent had never authorized its withdrawal. *Id.*

The court sustained the bank's res judicata defense. It noted that "because the issue as to the ownership of the money [was] identical with the issue raised in the probate proceeding, and [because] the order of the probate court settling the executor's account was a final adjudication of this issue on the merits, it remain[ed] only to determine whether the plaintiff in the present action [had been] a party or in privity with a party to the earlier proceeding." *Id.* at 813, 122 P.2d 892. The court held that, because she brought the action as administratrix of the estate, plaintiff "represent[ed] the very same persons and interests that were represented in the earlier hearing on the executor's account. In that proceeding plaintiff and the other legatees who objected to the executor's account represented the estate of the decedent. *They were seeking not a personal recovery but, like the plaintiff in the present action, as administratrix, a recovery for the benefit of the legatees and creditors of the estate, all of whom were bound by the order settling the account.*" *Id.* at 813–14, 122 P.2d 892 (emphasis added). The court therefore concluded that "[t]he plea of res judicata is ... available against plaintiff as a party to the former proceeding, despite her formal change of capacity." *Id.* at 814, 122 P.2d 892.[52]

██ Under New York law, an administrator or executor of a decedent's estate is a fiduciary of the estate's beneficiaries.[53]

---

**52.** Other California cases have concluded as well that the executor or administrator of a will is in privity with the will's beneficiaries. See, e.g., *Spotts v. Hanley*, 85 Cal. 155, 167, 24 P. 738 (1890) ("The administrator is in privity with and represents both heirs and creditors, and a judgment in ejectment recovered by or against an administrator is an estoppel in favor or against the heir and those claiming under him," citing *Cunningham v. Ashley*, 45 Cal. 485 (1873), and *McLeran v. Benton*, 73 Cal. 329, 14 P. 879 (1887)); see also *Estate of Baumann*, 201 Cal.App.3d 927, 935, 247 Cal.Rptr. 532 (1988) ("We are satisfied the district court judgment is binding on the Baumann children as beneficiaries of the trust created by Leola's will. As such, the trust is merely a derivative entity of the estate. Thus, any rights of the children in the proper-

ty accrue solely through the estate which, of course, is bound because it was a party to the district court action. '[W]hen a party acts in a representative capacity, and as such is lawfully authorized to litigate the questions at issue for those whom he represents, they as well as he are bound by the judgment.' Moreover, '[o]ne who succeeds to the interests of a party in the property or other subject of the action, after its commencement, is bound by the judgment with respect to those interests in the same manner as if he were a party'" (citations omitted)).

**53.** The notion that an executor is the fiduciary of the beneficiaries of an estate also finds support in California law. See *Larrabee v. Tracy*, 21 Cal.2d 645, 650, 134 P.2d 265 (1943) ("As executor of the estate and its

See N.Y. Est. Powers & Trusts Law § 11–1.1(a) (McKinney 1992); *Knox v. HSBC Bank, USA*, 16 A.D.3d 199, 791 N.Y.S.2d 101, 101 (N.Y.App.Div.2005) ("[A]n estate trustee's fiduciary duties to estate beneficiaries persist until affairs of estate are finally wound up"). The fiduciary is given power, *inter alia*, to act on the beneficiaries' behalf in numerous ways, including "[t]o invest and reinvest property of the estate or trust under the provisions of the will, deed or other instrument or as otherwise provided by law," "[t]o contest, compromise or otherwise settle any claim in favor of the estate, trust or fiduciary or in favor of third persons and against the estate, trust or fiduciary," and "[t]o execute and deliver agreements, assignments, bills of sale, contracts, deeds, notes, receipts and any other instrument necessary or appropriate for the administration of the estate or trust." N.Y. Est. Powers & Trusts Law § 11–1.1(b)(3), (13), (17); see also *Estate of Elder*, 90 Misc.2d 460, 395 N.Y.S.2d 337, 338–39 (Sur.Ct.1977) ("Letters of administration were granted to petitioner on November 14, 1972 and the same are still in full force and effect. Under such letters and pursuant to EPTL 11–1.1 she was granted the right to contest, compromise or otherwise settle any claim in favor of the estate, trust or fiduciary or in favor of third persons and against the estate, trust or fiduciary. She had and has the right to maintain an action as administratrix of decedent's estate, to recover damages for a wrongful act, neglect or default which caused the decedent's death against a person who would have been liable to the decedent by reason of such wrongful conduct if death had not ensued, EPTL 5–4.1. The only restrictions were and are that she is restricted and prohibited from receiving any money resulting from compromise, settlement or judgment as to any such action and from making any distribution thereof to any person until further order of this court").

The Second Circuit recognized the significance of the fiduciary relationship between the executor and the beneficiaries in *Bender v. City of Rochester*, 765 F.2d 7 (2d Cir.1985). There, it held that the City satisfied the requirements of due process in foreclosing on a decedent's estate by mailing notices of the tax foreclosure proceedings to the decedent's last known address instead of to the decedent's distributees. The court reasoned that the City was entitled to expect that the administrator of the decedent's estate would take steps to put the world on notice of the property owner's death and to obtain mail addressed to the decedent. *Id.* at 11. It noted that "[b]ecause in many cases it is impractical to expect a decedent's beneficiaries to act for themselves, state law provides for appointment of a fiduciary who is empowered to act on their behalf." *Id.* at 11–12 (citations omitted). In the case before it, the court held, the administrator of the estate "had the legal duty to

residuary legatee appellant had a clear duty to refrain from taking an unfair advantage of the impression he had created. An executor has numerous fiduciary obligations to the beneficiaries of the estate. In 1 Scott on Trusts (1939) it is stated (§ 6, p. 48): 'An executor is often called a trustee; and in the broad sense of the term so he is. * * * The relation between an executor or administrator and the legatees and distributees, like that between a trustee and the beneficiaries of the trust, is a fiduciary relation'"); *Estate of Hammer*, 19 Cal.App.4th 1621, 1637, 24 Cal. Rptr.2d 190 (1993) ("An executor is an officer of the court and occupies a fiduciary relation toward all parties having an interest in the estate. Executors occupy trust relations toward the legatees, and are bound to the utmost good faith in their transactions with the beneficiary." "An executor also bears a 'duty to disclose all the facts ... and to refrain from taking an unfair advantage of [the legatees],'" citing *Estate of Sanders*, 40 Cal.3d 607, 616, 221 Cal.Rptr. 432, 710 P.2d 232 (1985)).

collect and preserve his father's assets, to pay his father's debts, and to account for his acts to the distributees and deliver to them their intestate shares." *Id.* at 12 (citations omitted). Stated differently, the court observed, "[t]he administrator of a decedent's estate is in privity both with the decedent and with the decedent's beneficiaries." *Id.* (citing 1B MOORE'S FEDERAL PRACTICE ¶ 0.411[12] (1984)). Consequently, it concluded that the administrator, who had sued on his own behalf as a tenant in common of the property and as administrator of the estate of his father on behalf of the co-tenants, could not challenge the constitutionality of the City's procedures because, as administrator, he "was legally obligated to preserve the decedent's assets and, in order to protect himself from liability for breach of fiduciary duty, to inform the heirs of pending proceedings." *Id.*[54]

The fact that there is privity between an executor or administrator and the beneficiaries of an estate finds further support in the Restatement of Judgments. Section 41 of the Restatement (Second) of Judgments states:

"(1) A person who is not a party to an action but who is represented by a party is bound by and entitled to the benefits of a judgment as though he were a party. A person is represented by a party who is:

(a) The trustee of an estate or interest of which the person is a beneficiary; or

. . .

(c) The executor, administrator, guardian, conservator, or similar fiduciary manager of an interest of which the person is a beneficiary. . . .

(2) A person represented by a party to an action is bound by the judgment even though the person himself does not have notice of the action, is not served with process, or is not subject to service of process." RESTATEMENT (SECOND) OF JUDGMENTS § 41 (1982).[55]

Based on the federal authority discussed above, the statutes and case law of California and New York—the only two states in which Monroe's will was probated—and the Restatement (Second)of Judgments, the court is not persuaded by plaintiffs' argument that there was no privity between Frosch, the executor of Monroe's estate, and the beneficiaries of that estate.

**b. Whether Frosch Was Acting on Plaintiffs' Behalf in the California Tax Proceedings**

Having determined that there is privity as a legal matter between an executor and an estate's beneficiaries, the court must next examine whether, as a matter of fact, Frosch was representing plaintiffs' inter-

---

**54.** See also *Cicatello v. Brewery Workers Pension Fund,* 434 F.Supp. 950, 956 (W.D.N.Y. 1977) ("Here, the trustees, in defending the state court suit, were attempting to avoid a merger they believed would be deleterious to the Teamsters Fund and, necessarily, deleterious to the Teamsters Fund participants. This court finds that privity exists between the trustee and the trust beneficiaries, and the state court decision is thus binding on them by virtue of the doctrine of res judicata," citing 1B MOORE'S FEDERAL PRACTICE 0.411, at 1256 (2d ed.1974)).

**55.** The Restatement (First) of Judgments, which was in effect at the time of Monroe's

death, states that "a person who is not a party but who is in privity with the parties in an action terminating in a valid judgment is, to the extent stated in §§ 84–92, bound by and entitled to the benefits of the rules of res judicata." RESTATEMENT (FIRST) OF JUDGMENTS § 83 (1942). It further states that "[w]here a judgment is rendered in an action in which a party thereto properly acts on behalf of another, the other is (a) bound by and entitled to the benefits of the rules of res judicata with reference to such of his interests as at the time are controlled by the party to the action." *Id.,* § 85.

ests in the California tax proceedings. See *Bonilla Romero*, 836 F.2d at 43 ("Whether a party is virtually representative of a non-party is a question of fact determined on a case-by-case basis").

It is clear that Frosch submitted an affidavit to the inheritance tax appraiser in his capacity as executor of the estate—indeed, the affidavit so states.[56] Further-more, as it was the estate that was to be taxed and not Frosch in his individual capacity, it is clear that Frosch was acting on behalf of the estate and its beneficiaries in seeking to have state inheritance tax authorities find that Monroe was a non-resident of California when she died. Such a finding was necessary to ensure that California would tax only Monroe's California property, and not the entirety of her estate.

 As noted, plaintiffs do not dispute that they are the ultimate beneficiaries under Marilyn Monroe's will. Apart from arguing that privity does not exist as a matter of law, plaintiffs have raised no triable issues regarding the fact that Frosch was acting in a representative ca-pacity for the benefit of the estate and its beneficiaries in the California tax proceed-ings.[57] Stated differently, plaintiffs have

---

56. Soni Decl., Exh. G.

57. Plaintiffs argued at the hearing on this motion that Frosch should not be deemed to have been in privity with the beneficiaries of the estate because the beneficiaries later ar-gued that he had mismanaged the estate. Plaintiffs assert that, in particular, Dr. Mar-ianne Kris objected to Frosch's handling of the inheritance tax proceedings. They cite a petition to compel final accounting filed by Kris in the Surrogate's Court in March 1980. (This petition was submitted in support of plaintiffs' separate motion for partial sum-mary judgment, which was filed after defen-dants' motion for reconsideration.) In the petition, Kris contends that during the more than seventeen years of administration of the estate, she had not received adequate infor-mation regarding the estate or her entitle-ments as a beneficiary. (See Confidential Declaration of David Strasberg in Support of Marilyn Monroe LLC's and Anna Strasberg's Motion for Partial Summary Judgment ("Strasberg Decl."), Exh. 16). Kris com-plained that Frosch "ha[d] retained posses-sion of assets of the Estate that [were] not required for the trust or for any debt or ex-pense, to the detriment of the legatees and the Estate." (*Id.*).

As can be seen, Kris's objection did not concern Frosch's administration of tax issues in general or the inheritance tax proceeding in particular. To the contrary, Kris apparent-ly asserted that she was entitled to receive her distribution from the estate because she un-derstood "that the California tax proceedings had been completed" and that "all outstand-ing debts of the Estate [had] been satisfied and all estate taxes had been paid by the end of 1976." (*Id.*). Far from reflecting an objec-tion to the manner in which Frosch handled the tax proceedings, these statements demon-strate Kris's acquiescence in Frosch's ap-proach. The only complaint Kris made re-specting taxation was that Frosch had "failed during several tax years to make a distribu-tion of Estate income to those entitled to receive the same, ... with the result that the Estate was obliged to pay unnecessary income taxes and with the further result that assets of the Estate were unnecessarily depleted." (*Id.*) This criticism regarding tax liability resulting from Frosch's failure to distribute assets does not show, as plaintiffs contend, that Kris ob-jected to the inheritance tax proceeding that defendants cite as grounds for judicial estop-pel. Plaintiffs, therefore, have not successful-ly raised triable issues regarding the fact that Kris, one of MMLLC's predecessors-in-inter-est, was not in privity with Frosch in the California inheritance tax proceedings.

Plaintiffs also argued at the hearing that Frosch did not act for the benefit of Lee Strasberg, another predecessor-in-interest, in connection with a later dispute regarding transparencies of Monroe photographs taken by Tom Kelley. Strasberg claimed that he was entitled to the transparencies because Monroe had purchased them before her death, and disputed Kelley's claim that he was the owner. Plaintiffs cite two affidavits Frosch submitted to the Surrogate's Court, which were offered as exhibits to defendants' initial motion for summary judgment and cit-ed in plaintiffs' opposition to that motion.

not shown that triable issues remain as to whether Frosch was acting for *their* ultimate benefit. The court therefore concludes that MMLLC and Anna Strasberg are in privity with Frosch.[58]

In the first affidavit, Frosch stated that he had no basis to dispute Kelley's assertion that the transparencies were owned by him and had simply been loaned to Monroe before her death. (Declaration of Greg T. Hill Submitted in Support of The Milton H. Greene Archives, Inc.'s and The Tom Kelley Studios, Inc.'s Motion for Summary Judgment ("Hill Decl."), Exh. 19). Ultimately, however, Frosch took "no position in relation to the ownership of the said transparencies but pray[ed] the Court … reach a decision in regard to the ownership thereof, so they [could] be distributed by the Estate to their rightful owner." (*Id.*). In the second affidavit, Frosch reiterated that a "question exist[ed] as to whether said transparencies were owned by Miss Monroe at the time of her death, and [whether] they were assets of the Estate." (*Id.*, Exh. 20). Strasberg apparently relied on the statements of Monroe's friends and associates, who advised him that Monroe had purchased the transparencies from Kelley. (*Id.*). Not being a witness to the alleged purchase, Frosch was unable to represent to the court that Strasberg was the rightful owner of the transparencies. While Frosch does not appear to have advocated for Strasberg's interests in connection with this dispute, he clearly did not, as plaintiffs claim, act contrary to Strasberg's interests. Frosch merely stated that, lacking sufficient facts, he was unable to take a position as to ownership. (See *id.*, Exh. 19). As respects this transaction as well, therefore, plaintiffs have failed to show that Frosch acted contrary to the interests of the estate and its beneficiaries, such that a finding of privity would be inappropriate.

**58.** This conclusion finds support in cases applying the somewhat analogous "duty of consistency," which "serves to prevent inequitable shifting of positions by taxpayers" in proceedings before the Internal Revenue Service. See *Janis v. Commissioner of Internal Revenue*, 461 F.3d 1080, 1085 (9th Cir. 2006). The duty " 'is usually understood to encompass both the taxpayer and parties with sufficiently identical economic interests.' " *Id.* (quoting *LeFever v. Comm'r*, 100 F.3d 778, 788 (10th Cir.1996)). The Ninth Circuit set forth the elements necessary for application of the duty of consistency in *Estate of Ashman v. Commissioner*, 231 F.3d 541 (9th Cir.2000):

"(1) A representation or report by the taxpayer; (2) on which the Commission [er] has relied; and (3) an attempt by the taxpayer after the statute of limitations has run to change the previous representation or to recharacterize the situation in such a way as to harm the Commissioner. If this test is met, the Commissioner may act as if the previous representation, on which he relied, continued to be true, even if it is not. The taxpayer is estopped to assert the contrary." *Id.* at 545.

In *Janis*, the court applied the duty of consistency to a party, Conrad, who had "overlapping and co-extensive interests" as a beneficiary and co-executor of an estate. *Janis*, 461 F.3d at 1085. "As an heir, Conrad had an economic interest in reducing the value of the taxable estate, and as co-executor, he had privity of interest with the estate, thus making the duty of consistency appropriate under these circumstances." *Id.* at 1085–86 (citing *LeFever*, 100 F.3d at 789 (holding that heirs to an estate are bound by the duty of consistency when they have an economic interest in the matter and sufficient privity with the executor of an estate); *Hess v. United States*, 210 Ct.Cl. 483, 537 F.2d 457, 464 (1976) (holding that a taxpayer who had a sufficient economic interest in an estate and a trust was bound by an earlier representation); *Estate of Letts v. Comm'r*, 109 T.C. 290, 298–99, 1997 WL 727721 (U.S.Tax Ct.1997) (applying the duty of consistency to bind taxpayers who were heirs and fiduciaries of an estate to representations made on estate tax returns)). The court reasoned that "Conrad was not only a beneficiary of the estate—giving him ample economic interest in minimizing the estate taxes—he was also a co-executor of the estate—giving him a clear fiduciary duty. As co-executor and beneficiary of the estate, Conrad had an incentive to minimize the value of the collection, thereby minimizing the estate's tax and maximizing his inheritance." *Id.* at 1086; see also *LeFever*, 100 F.3d at 788–89 ("[T]he duty of consistency is usually understood to encompass both the taxpayer and parties with sufficiently identical economic interests. In this case, Petitioner William LeFever was the executor of Decedent's estate. He filed the special use valuation election. He and Petitioner Betty Lou LeFever

### 5. Whether the Statements are Inconsistent With Plaintiffs' Current Position

Because plaintiffs and Frosch are in privity, the question becomes whether plaintiffs' current position regarding Monroe's domicile is "clearly inconsistent" with the position Frosch and his attorneys took in the California tax proceedings. Plaintiffs argue that it is not, asserting that the question here is Monroe's domicile at the time of her death, while the statements that Frosch and others made on the estate's behalf addressed Monroe's residence. A careful review of California inheritance tax law belies this contention, and reveals that the statements are, in fact, inconsistent.

#### a. California Inheritance Tax Law

As noted, " '[a] person's domicile is her permanent home, where she resides with the intention to remain or to which she intends to return.' " *Gaudin*, 379 F.3d at 636 (quoting *Kanter*, 265 F.3d at 857). " 'A person residing in a given state is not necessarily domiciled there.' " *Id.* (quoting *Kanter*, 265 F.3d at 857). "It is true[, however,] that 'domicile' and 'residence' are usually in the same physical location." *Whittell v. Franchise Tax Bd.*, 231 Cal. App.2d 278, 284, 41 Cal.Rptr. 673 (1964). As a result, in many statutes, " 'residence' is frequently construed to mean domicile and the terms are often used synonymously." *Id.* (citing CAL. GOV'T CODE §§ 243,

244; CAL. PROB.CODE § 301; CAL. CIV.CODE § 128; CAL.CODE CIV. PROC. §§ 395, 417); The California Supreme Court has recognized that many statutes use "residence" and "domicile" synonymously:

"Courts and legal writers usually distinguish 'domicile' and 'residence,' so that 'domicile' is the one location with which for legal purposes a person is considered to have the most settled and permanent connection, the place where he intends to remain and to which, whenever he is absent, he has the intention of returning, but which the law may also assign to him constructively; whereas 'residence' connotes any factual place of abode of some permanency, more than a mere temporary sojourn. 'Domicile' normally is the more comprehensive term, in that it includes both the act of residence and an intention to remain; a person may have only one domicile at a given time, but he may have more than one physical residence separate from his domicile, and at the same time. But statutes do not always make this distinction in the employment of those words. They frequently use 'residence' and 'resident' in the legal meaning of 'domicile' and 'domiciliary,' and at other times in the meaning of factual residence or in still other shades of meaning. For example, in our codes 'residence' is used as synonymous with domicile in the following statutes: sections 243 and 244 of the Government Code, giving the basic rules

provided the information on which their accountant based the election. They both signed a consent form to the taking of the election. Lastly, as the qualified heirs of parcels 2 through 5, Petitioners had an economic interest in reducing the value of the taxable estate in 1984. Petitioners had sufficient privity of interest with the estate's executor for the application of the duty of consistency" (citations omitted)); *Beltzer v. United States*, 495 F.2d 211, 211–13 (8th Cir.1974) (holding that under the duty of consistency, a brother and sister who were co-executors of and heirs

to an estate were individually bound by their representations in an estate tax return).

Here, like the party in *Janis*, Frosch as executor had a fiduciary duty to minimize the taxes paid by Monroe's estate. Plaintiffs' predecessors-in-interest had an economic interest in reducing the value of the taxable estate. Given that the interests of Frosch and plaintiffs' predecessors were aligned as respects the representations made to the California inheritance tax appraiser, it is appropriate to find that they were in privity with one another.

generally regarded as applicable to domicile; section 301 of the Probate Code, relating to jurisdiction for the administration of decedents' estates; and section 128 of the Civil Code, providing that a divorce must not be granted unless the plaintiff has been 'a resident' of the state for one year." *Smith v. Smith,* 45 Cal.2d 235, 239, 288 P.2d 497 (1955) (citations omitted).

See also *Kirk v. Board of Regents of University of Cal.,* 273 Cal.App.2d 430, 434–35, 78 Cal.Rptr. 260 (1969) ("[D]espite the fact that the terms residence and domicile are often used synonymously, residence is not a synonym for domicile, and its meaning in particular statutes is subject to differing construction, depending on the context and purpose of the statute in which it is used").

Under California's Inheritance Tax Law, found at California Revenue & Tax Code § 13301 et seq.,[59] "the tax imposed is on the right to succeed to property." *In re Carson's Estate,* 234 Cal.App.2d 516, 523, 44 Cal.Rptr. 360 (1965) (citing *Estate of Radovich,* 48 Cal.2d 116, 121, 308 P.2d 14 (1957)). Under § 13401, " '[a]n inheritance tax is hereby imposed upon every transfer subject to this part.' " See *In re Vai's Estate,* 65 Cal.2d 144, 157 n. 1, 52 Cal. Rptr. 705, 417 P.2d 161 (1966) (Traynor, C.J., dissenting) (citing former CAL. REV. & TAX.CODE § 13401). Under § 13601, " '[a] transfer by will or the laws of succession of this State from a person who dies seized or possessed of the property transferred while a resident of this State is a transfer subject to this part.' " *Id.* (citing former CAL. REV. & TAX.CODE § 13601, added by CAL. STATS. 1943, c. 658, § 1). The transfer by a nonresident of tangible personal assets and real property located in California is also subject to California inheritance tax. See *Chambers v. Mumford,* 187 Cal. 228, 230, 201 P. 588 (1921); see also 18 CAL.CODE REGS. § 13303.2 ("Real property in this State belonging to a nonresident transferor is subject to the Inheritance Tax Law.... Tangible personal property permanently in this State belonging to a nonresident transferor is subject to the Inheritance Tax Law").[60]

Regulations promulgated in 1945 to implement the Inheritance Tax Law define the terms used in the statute. The regulations provide that " 'residence,' as used in these Rules and Regulations, is synonymous with legal residence or domicile." 18 CAL.CODE REGS. § 13303.4 (formerly 18 CAL.CODE REGS. § 638 (1945)). A "resident" is defined as "a person whose residence is in the State of California." 18 CAL.CODE REGS. § 13303.6 (formerly 18 CAL.CODE REGS. § 640 (1945)). A "nonresident" is "a person whose residence is outside the State of California." 18 CAL.CODE REGS. § 13303.7 (formerly 18 CAL.CODE REGS. § 641 (1945)).

---

**59.** California's Inheritance Tax Law was repealed in 1982. See *Estate of Goshen,* 167 Cal.App.3d 97, 98 n. 1, 212 Cal.Rptr. 919 (1985) (citing CAL. STATS. 1982, ch. 1535, § 14).

**60.** See also 18 CAL.CODE REGS. § 14651 ("In the case of a decedent who died a resident of California, the superior court of the county in which he last resided as a rule has jurisdiction to hear and determine all questions relative to any tax imposed by the Inheritance Tax Law on any transfer by him"); *id.,* § 14653 ("In the case of a decedent who died a nonresident of California, the superior court of the county in which any of the decedent's real property is situated, or, if he owned no real property in this State, then the superior court of any county in which any of his personal property is situated, as a rule has jurisdiction to hear and determine all questions relative to any tax imposed by the Inheritance Tax Law on any transfer by the decedent. If the decedent leaves real or personal property in more than one county in this State, the superior court of any such county which first acquires jurisdiction will retain the same to the exclusion of the superior court of any other such county").

These regulations demonstrate that under California's Inheritance Tax Law, residence and domicile are synonymous. Therefore, a party arguing for inheritance tax purposes that a decedent was a resident of another state (i.e., a non-resident of California) was effectively arguing that the decedent was not domiciled in California. The procedure for making such an argument is set forth in the regulation defining "residence." It states that "[w]hen a claim is made that the residence [i.e., domicile] of a transferor was outside the State of California and a court proceeding to determine the inheritance tax is pending, an affidavit in support of the claim must be filed with the inheritance tax appraiser on form IT–2, entitled 'Declaration Concerning Residence.'" 18 Cal. Code Regs. § 13303.4.[61]

### b. Frosch's Statements to the Inheritance Tax Appraiser

These regulations demonstrate that in arguing to the inheritance tax appraiser that Monroe was not a resident of California, but a resident of New York, at the time of her death, Frosch was contending that Monroe was domiciled in New York.

The letter prepared by Frosch's counsel and submitted to the inheritance tax appraiser asserts that Monroe was a "non-resident of the State of California at the time of her death." [62] In support, Frosch submitted Form No. I.T.2, the "Affidavit Concerning Residence," as required by the regulation defining "residence." [63] The questions on the form addressed many of the factors typically used to determine a person's domicile,[64] e.g., the last place Monroe voted, where she filed her last income tax return, whether and where she owned a home, where she actually lived at the time of death, whether she belonged to a church in California, whether she engaged in business in California, whether she had family in California, and whether she made statements or declarations regarding her residence.[65] In his responses to the questions on the form, Frosch repeatedly asserted that Monroe was residing temporarily in California for the sole purpose of working on a motion picture, and that she "in all respects retained her permanent residence in New York." [66]

The declarations submitted by Monroe's friends and employees likewise addressed Monroe's "permanent residence"—i.e., her domicile.[67] Monroe's friend, Ralph Rob-

---

61. The original version of this regulation denominated the form "Form No. 2 entitled 'Affidavit Concerning Residence.'" (18 Cal. Code Regs. § 638 (1945)).

62. Soni Decl., Exh. F.

63. Id., Exh. G.

64. Among the factors considered in determining domicile are an individual's "current residence, voting registration and voting practices, location of personal and real property, location of brokerage and bank accounts, location of spouse and family, membership in unions and other organizations, place of employment or business, driver's license and automobile registration, and payment of taxes." Lew, 797 F.2d at 750 (citations omitted).

65. Soni Decl., Exh. G.

66. Id.

67. Plaintiffs object to the declarations on numerous grounds, arguing that they lack foundation, state improper legal opinions, and are based on inadmissible hearsay. (Pl.'s Objections at 6). Plaintiffs also contend that statements of Monroe's intent should be given little weight and that her domicile should be determined by reference to objective facts. (Id. at 5–6).

The court need not rule on these objections because the truth of the statements made and nature of the opinions expressed in the declarations are not relevant to the issue raised by defendants' motion. The question before the court is not Monroe's *actual* domicile, but whether plaintiffs are estopped to assert that her domicile was other than in New York. The declarations are evidence that was presented

erts, stated that Monroe repeatedly told him that her trips to California were merely visits and that she considered New York her permanent home and permanent residence.[68] Similarly, Monroe's personal housekeeper, Hattie Stephenson, asserted that Monroe left all of her furnishings and many personal belongings in her New York apartment when she went to California temporarily to work, and that Monroe intended to return shortly to her permanent residence in New York.[69]

Based on the regulations defining "residence" and the content of counsel's cover letter, Frosch's form affidavit, and the supporting declarations submitted to the inheritance tax appraiser, the court concludes that Frosch took the position in the California inheritance tax proceeding that Monroe was domiciled in New York at the time of her death.[70]

---

to the inheritance tax appraiser by Frosch and his counsel, and are relevant and admissible in this proceeding because they demonstrate the position taken by plaintiffs' privies in the prior proceeding.

68. *Id.*, Exh. H.

69. *Id.*, Exh. I.

70. Further support for this conclusion is found in the correspondence of the executor's counsel, Gang, Tyre, Rudin & Brown, that has been submitted by plaintiffs. Defendants object to this correspondence, *inter alia*, as unauthenticated and lacking foundation. (Defendants' Objections to the Declaration of Laura A. Wytsma in Support of Opposition to Motion for Reconsideration of Order Finding No Judicial Estoppel and Collateral Estoppel as to Domicile of Marilyn Monroe ("Def.'s Objections") at 42–43).

Because the court does not rely on the letters, it need not rule on defendants' objections. It notes, however, that in a 1964 letter to Frosch, Hermione Brown, a partner at Rudin, Brown, enclosed an Affidavit Concerning Residence and asked Frosch to complete and return it. (Declaration of Laura A. Wytsma in Support of Opposition to Motion for Reconsideration of Order Finding No Judicial Estoppel and Collateral Estoppel as to Domicile of Marilyn Monroe ("Wytsma Decl."), Exh. 83). Brown advised that the Affidavit was needed "to counteract the fact that Miss Monroe owned a home and actually was living in California at the time of her death, and that her mother is physically in California." (*Id.*). Brown noted that "should the State of California reject the contention that Miss Monroe was a non-resident of California, then, of course, there would be a serious tax situation [for the estate]." (*Id.*)

In a 1966 letter to Monroe's friend Ralph Roberts, attorney Elliot Lefkowitz of Weissberger & Frosch explained that Roberts' affidavit was needed "to establish that decedent's permanent home was in New York and not in California." (*Id.*, Exh. 84).

On March 4, 1966, Brown advised Lefkowitz that she had "pulled together all of the documentation needed for the California Inheritance Tax Affidavit." (*Id.*, Exh. 85). She explained that

"[i]f the California non-residence is supported, the estate here is clearly insolvent and there should be no tax problem with the California authorities. On the other hand, if the California authorities take the position that Miss Monroe was or may have been a resident of California at the time of her death, then there will be a hearing at which Aaron [Frosch] will have to appear and at that time they will also examine in more detail all of the New York assets and liabilities." (*Id.*).

In September 1966, Brown asked Inez Melson, an associate of Monroe's who had been appointed special Administratrix of Monroe's estate in California following her death, for an affidavit. (*Id.*, Exh. 87). Brown asked Melson if she recalled any information about Monroe that would "substantiate the fact that she regarded New York as her permanent residence and intended to return there." Brown explained that such information would be of assistance because

"[t]he executor of Miss Marilyn Monroe's estate has taken the position that she died domiciled in the State of New York and that her physical presence in California was merely a temporary sojourn for the purposes of acting in a motion picture and/or obtaining psychiatric treatment. For legal purposes, a person can have only one domicile—although he or she may have many 'homes.' It is of significant tax importance to the estate to establish that New York—not California—was Miss Monroe's domicile." (*Id.*).

#### c. Plaintiffs' Statements in this Action

Plaintiffs currently take the position that Monroe was domiciled in California at the time of her death.[71] On its face, this position is "clearly inconsistent" with the position taken by Frosch on behalf of the estate and its beneficiaries in the California tax proceeding. Apart from arguing that the positions are not inconsistent because Frosch was addressing Monroe's residence—an argument with which the court disagrees—plaintiffs adduce no evidence indicating that the positions are not "clearly inconsistent." Instead, they argue that the doctrine of judicial estoppel applies to purely factual statements only, and thus that it cannot bar inconsistent positions regarding a decedent's domicile, which is a mixed question of law and fact.[72]

The Ninth Circuit has clearly held, however, that "[j]udicial estoppel applies to a party's stated position whether it is an expression of intention, a statement of fact, or a legal assertion." *Wagner*, 354 F.3d at 1044 (citing *Helfand*, 105 F.3d at 535). Plaintiffs' reliance on *Cleveland*, 526 U.S. 795, 119 S.Ct. 1597, in this regard is unavailing. In *Cleveland*, the trial court entered summary in favor of a defendant employer on judicial estoppel grounds, finding plaintiff's assertion that she was totally disabled in proceedings to obtain social security disability benefits ("SSDI") contradicted her allegation in an Americans with Disabilities Act ("ADA") claim that she was able to perform the "essential functions of her job." *Id.* at 798–99, 119 S.Ct. 1597. The Court reversed. It noted that under the ADA, a "qualified" disabled person is someone who can perform the essential functions of a job with reasonable accommodation. *Id.* at 803, 119 S.Ct. 1597. In determining whether a person is disabled for SSDI purposes, by contrast, the

Social Security Act ("SSA") does not take the possibility of "reasonable accommodation" into account. *Id.* Given this difference, the Court determined that the grant of summary judgment had been improper because plaintiff had offered a sufficient explanation reconciling her apparently inconsistent statements regarding "disability." In reaching this result, the Court noted that determining disability required a "context-related legal conclusion," i.e., a mixed question of law and fact. *Id.* at 802, 807, 119 S.Ct. 1597.

*Cleveland* does not hold that judicial estoppel cannot be applied to a mixed question of law and fact. To the contrary, although noting that most cases that have applied the doctrine had involved purely factual contradictions, the Court stated that "a similar insistence upon explanation [was] warranted ... where the conflict involve[d] a legal conclusion." *Id.* at 807, 119 S.Ct. 1597. The Court applied the same standard used in assessing whether inconsistencies in factual positions warrant application of judicial estoppel—i.e., that "a party cannot create a genuine issue of fact sufficient to survive summary judgment simply by contradicting his or her own previous sworn statement ... without explaining the contradiction or attempting to resolve the disparity"—and accepted plaintiff's explanation of the inconsistency between her position in the SSA and ADA cases. *Id.* at 805, 807, 119 S.Ct. 1597.

The *Cleveland* Court thus clearly signaled that a party who could not provide a sufficient explanation for taking apparently contradictory legal positions could be estopped; it in no way held that judicial estoppel applies only to purely factual statements. Nor has it been interpreted that way. See, e.g., *Churchill v. Winter Chevrolet*, C 04–489 JCS, 2005 WL 281170, * 8 n. 3 (N.D.Cal. Feb.4, 2005) ("*Cleveland*

---

71. See, e.g., Pl.'s Opp. at 12.

72. *Id.* at 24.

is ... relevant to Plaintiff's argument that judicial estoppel applies *only* to factual assertions. The Court's discussion in *Cleveland* makes clear that Plaintiff oversimplifies the issue. As the Court acknowledged, an assertion that an individual is totally disabled is a mixed question of fact and law rather than a purely factual assertion. While the Court suggested that the doctrine of judicial estoppel is less likely to be applied under those circumstances, it did not hold that the doctrine could not, therefore, apply. Rather, the Court explained that the doctrine of judicial estoppel may, under some circumstances, apply to mixed statements of fact and law").

Because plaintiffs offer no reasoned explanation of the inconsistency between Frosch's position in the California inheritance tax proceedings and their position here, they have failed to demonstrate that judicial estoppel cannot properly be applied to bar their current argument.

6. **Whether the Inconsistent Statements Were Successfully Advanced, Sufficient to Create the Perception That Either the First or Second Court was Misled**

a. **Whether the Inheritance Tax Appraiser is a Quasi–Judicial Body**

■■■ The doctrine of judicial estoppel applies not only where prior inconsistent statements are made in a "judicial" proceeding, but also in an administrative proceeding. See *Rissetto*, 94 F.3d at 604 ("Though called judicial estoppel, the doctrine has been applied, rightly in our view, to proceedings in which a party to an administrative proceeding obtains a favorable order that he seeks to repudiate in a

subsequent judicial proceeding," (citing *Chaveriat v. Williams Pipe Line Co.*, 11 F.3d 1420, 1427 (7th Cir.1993), and collecting cases); *Smith v. Montgomery Ward & Co.*, 388 F.2d 291, 292 (6th Cir.1968) (position taken in a workers' compensation proceeding estopped a party in a subsequent personal injury action); *Simo v. Home Health & Hospice Care*, 906 F.Supp. 714, 718 (D.N.H.1995) (Social Security Administration disability proceeding); *UNUM Corp. v. United States*, 886 F.Supp. 150, 158 (D.Me.1995) (Maine Bureau of Insurance approval proceeding); *Zapata Gulf Marine Corp. v. Puerto Rico Maritime Shipping Auth.*, 731 F.Supp. 747, 750 (E.D.La.1990) (Interstate Commerce Commission proceeding); *Muellner v. Mars, Inc.*, 714 F.Supp. 351, 357–58 (N.D.Ill. 1989) (SSA proceeding) (applying Illinois law)); see also *Synopsys, Inc. v. Magma Design Automation, Inc.*, C 04–3923 MMC, 2007 WL 322353, *26 (N.D.Cal. Jan.31, 2007) (applying the doctrine with respect to prior statements made to the U.S. Patent and Trademark Office); *In re Pich*, 253 B.R. 562, 569 n. 16 (Bankr.D.Idaho 2000) (holding that a county commission's ruling on a rezoning application qualified as quasi-judicial activity). "This rule has been justified on the ground that '[t]he truth is no less important to an administrative body acting in a quasi-judicial capacity than it is to a court of law.' " *Id.* (quoting *Muellner*, 714 F.Supp. at 357).

The California inheritance tax appraiser, to whom the prior statements regarding Monroe's domicile were made, performs quasi-judicial functions for the California state courts. As the California Court of Appeal has explained, inheritance tax appraisers nominated by the State Controller's office [73] are "appointed [by superior

---

73. "The appraiser is required to forward to the State Controller his reports, copies of work receipts and other documents, which are then audited. The State Controller responds to the state inheritance tax appraiser after the audit is completed, either by giving his permission to him to file the proposed report with the superior court or requiring him to make partial or complete corrections

courts] to make specific appraisals of a tax due to the state." *Greenaway*, 269 Cal. App.2d at 52, 74 Cal.Rptr. 452.

"In his work for the superior court and the judges there presiding in probate matters, ... the inheritance tax appraiser ha[s] duties as an employee designated by the judicial officers who were carrying on necessary state and county duties." *Id.* at 54, 74 Cal.Rptr. 452; see also *In re Castillo*, 297 F.3d 940, 947–48 (9th Cir.2002) (indicating that "judicial immunity has been readily extended to such nonjudicial officers as: ... 'to assessors upon whom is imposed the duty of valuing property for the purpose of a levy of taxes,'" quoting *Burns v. Reed*, 500 U.S. 478, 499–500, 111 S.Ct. 1934, 114 L.Ed.2d 547 (1991)); *Worcester County Trust Co. v. Long*, 14 F.Supp. 754, 760 (D.Mass.1936) ("It is quite apparent from an examination of the applicable statutes of California Inheritance Tax Act of 1935 that the inheritance tax appraiser, designated by the court having jurisdiction over the estate, performs functions which, at least, could be said to be quasijudicial"); *In re Wyman's Estate*, 208 Cal.App.2d 489, 490–91, 25 Cal.Rptr. 280 (1962) (noting that objections to an inheritance tax appraiser's report were overruled and the report was approved by the superior court).

As *Greenaway* makes clear, inheritance tax appraisers act in a quasi-judicial capacity in assessing the amount of inheritance tax to be paid. In brief, the appraiser takes evidence from the parties on the issue of residence/domicile,[74] seeks additional evidence as necessary,[75] makes a determination of the decedent's residence, and submits a report to the superior court, which may or may not approve the report.[76] Given the quasi-judicial nature of the appraiser's duties, it is appropriate to apply judicial estoppel to statements made to him in the course of his duties.

**b. Whether the Statements Were Successfully Advanced**

Citing the fact that judicial estoppel is properly applied "only if the court has relied on the party's previously inconsistent statement," [77] see *Interstate Fire & Cas. Co. v. Underwriters at Lloyd's, London*, 139 F.3d 1234, 1239 (9th Cir.1998) (citing *Masayesva v. Hale*, 118 F.3d 1371, 1382 (9th Cir.1997)), plaintiffs argue that Frosch did not "prevail" in the California tax proceeding. Specifically, they assert that the estate sought to avoid taxation and instead was taxed $777.[78] This argu-

---

[74] Indeed, the inheritance tax regulations provide that when there is a claim that a decedent transferor was a nonresident of California, the "Declaration Concerning Residence" must be submitted to the inheritance tax appraiser, not to the superior court. See 18 CAL.CODE REGS. § 13303.4.

in the report that are necessary in order to comply with the law. Often an appraiser is required to rewrite the report or to submit a new report for audit. In addition, the inheritance and gift tax division of the State Controller's office requires information be submitted to it regarding appraisal in specific cases; for example, in cases of closely held corporations, documents which bear on the question involved may be requested of the appraiser to substantiate his work." *Greenaway v. Workmen's Comp. Appeals Bd.*, 269 Cal.App.2d 49, 51–52, 74 Cal.Rptr. 452 (1969).

[75] One of the documents submitted by plaintiffs indicates that the state controller's office sought additional information regarding Monroe's residence from the estate following submission of the residence affidavits. (See Wytsma Decl., Exh. 35). Because defendants object to the document on foundational grounds, the court does not consider it. (See Def.'s Objections at 19).

[76] See Soni Decl., Exh. N.

[77] *Id.*

[78] Pl.'s Opp. at 17.

ment overlooks the full extent of the rulings the estate sought from the inheritance tax appraiser, and the statements on which the appraiser relied.

The letter the executor's attorney wrote to the appraiser requested (1) a determination that Monroe was a non-resident of California under the Inheritance Tax Law; and (2) a "no tax certificate" due to the estate's alleged insolvency.[79] While it is true that the estate did not completely avoid taxation, the appraiser nonetheless accepted the estate's position regarding domicile, determined that Monroe was a resident of New York, and relied on this finding in assessing inheritance tax. The appraiser's report to the superior court stated that a hearing had been held, and that he had determined that Monroe was "a resident of the county New York, State of New York" at the time of her death.[80] He went on to state that, despite being domiciled in New York, Monroe "left property taxable under the inheritance tax laws of the State of California." [81]

Under the inheritance tax law, the only property of a non-resident decedent that is taxable is real property and "tangible personal property"; "intangible personal property," such as stocks, bonds, notes, and bank deposits, is not taxable. See 18 CAL.CODE REGS. §§ 617, 664–666 (1945). The appraiser valued the portion of Monroe's estate that was taxable in California at $92,761.[82] This is in stark contrast to the gross value of Monroe's estate in New York, which was valued at $836,521.31, and included stocks, insurance policies, and royalty payments.[83] Given the difference in these numbers, it is clear that the appraiser relied on his finding that Monroe was domiciled in New York in determining

the value of property that could be taxed in California. Although the appraiser ultimately assessed tax of $777, and denied the estate's request for a no tax certificate, there can be no doubt that the estate successfully advanced its position regarding Monroe's domicile and avoided higher taxation.

It is undisputed, moreover, that the superior court ultimately accepted the appraiser's report. This is evident from a later filing Frosch made in superior court seeking executor's commissions and attorney's fees.[84] In a section addressing the "extraordinary services" the estate's attorneys had rendered regarding tax matters, the petition stated:

"Although decedent's domiciliary probate is handled in New York, decedent was physically in California and owned real property here at the time of her death. Petitioner's attorneys rendered extensive services in connection with the preparation of the California Inheritance Tax Affidavit and Affidavit Concerning Residence, together with supporting affidavits, in order to establish that decedent was a nonresident of California at the time of her death, and in order to assemble and segregate correctly those items of receipts and expenses attributable to California for assessment. Petitioner's attorneys corresponded with and interviewed several persons with respect to decedent's nonresident status, suggested to the ancillary executor the types of evidence to be secured to substantiate this position and prepared various affidavits which were submitted in support of such position. *Said attorneys engaged in correspondence with the California State Controller's office,*

---

79. Soni Decl., Exh. F.

80. *Id.*, Exh. N.

81. *Id.*

82. *Id.*

83. *Id.*, ¶ 11, Exh. O.

84. Soni Decl., Exh. W.

*explaining in detail their factual and legal position and ultimately were successful in obtaining a determination that decedent was not a resident of California at the time of her death. As a result of such determination, none of decedent's contract rights were included in measuring such tax in California.*[85]

Similarly, in a First and Final Account of Ancillary Executor that Frosch filed in superior court in 1976, he stated that the estate had "obtained a determination that decedent was a non-resident of California at the time of her death for inheritance tax purposes," and that "[t]he California Inheritance Tax for said estate *has been determined and paid in full.*"[86]

That the California taxing authorities accepted Frosch's argument regarding domicile is also confirmed by subsequent tax proceedings in the state. As discussed in the court's January 7, 2008 order, for example, the California Franchise Tax Board later sought to tax Monroe's percentage payments, i.e., the earnings she made from films in which she appeared.[87] In an appeal to the California State Board of Equalization ("BOE"), Frosch argued that the estate should not have to pay California income tax on these amounts. The BOE denied Frosch's appeal in 1975. In its decision, the Board classified Monroe's earnings as "personal services income," whose source was the place where the services were performed.[88] BOE stated that the percentage payments were taxable because Monroe performed the services giving rise to them in California, and noted that personal income tax was due on "the entire taxable income of every *nonresident* which is derived from sources within the state."[89] Because Monroe con-

---

**85.** *Id.* (emphasis added). Plaintiffs object to this document, as well as several others, on relevance grounds, asserting that they speak only to Monroe's residence, not her domicile. (See Pl.'s Objections at 15). The court has determined, however, that for purposes of the inheritance tax proceeding, residence was legally synonymous with domicile. Thus, the objections are overruled.

**86.** Supplemental Declaration of Laura A. Wytsma in Opposition to Motion for Reconsideration of Order Finding No Judicial and Collateral Estoppel as to Domicile of Marilyn Monroe ("Wytsma Supp. Decl."), Exh. A (emphasis added).

**87.** Soni Decl., Exh. V.

**88.** *Id.*

**89.** *Id.* (citing Cal. Rev. & Tax Code § 17041(a) (emphasis added)). Plaintiffs contend that they should not be estopped by Frosch's representations regarding Monroe's domicile because those representations actually harmed the estate by resulting in double taxation of Monroe's percentage payment income from "Some Like it Hot" and "The Misfits." As noted, although it determined that Monroe was a "nonresident," California taxed her percentage payment income because it was derived from personal services Monroe per-

formed in California. In addition, the estate also paid income tax on the percentage payments in New York. (See Soni Decl., Exh. V). As a result, Frosch sought a credit under California Revenue & Taxation Code § 18004, which states that "[i]f an estate or trust is a resident of this State and also a resident of another state, it shall ... be allowed a credit against the taxes imposed by this part for net income taxes imposed by and paid to another state." (*Id.*)

The Board of Equalization concluded that the estate was not entitled to a credit because under § 18003, "an estate or trust is considered a resident of the state which taxes the income of the estate or trust irrespective of whether the income is derived from sources within the state." (*Id.*). The Board noted that, under § 18003,

"an estate is a resident of California only if this state taxes its income from sources both within and without the state. Since California taxes an estate's income from all sources only when the decedent was a resident of this state, only estates of resident decedents are residents of California for purposes of the tax credit provisions of sections 18001–18011. Consequently, Miss Monroe having been a New York resident at the time of her death, appellant is not a resident of California and is not entitled to

tinued to be taxed as a nonresident, it is apparent that the estate successfully advanced the position that she was domiciled in another state.[90]

Given that the estate successfully argued to the California taxing authorities

. the tax credit authorized by section 18004." (*Id.*).

While it is possible that the estate paid more taxes on Monroe's percentage payments than it would had she been found to be a domicile of California, this does not change the fact that the estate derived a benefit from the fact that California assessed inheritance tax only on $92,761 of Monroe's assets rather than $836,521.31. As the BOE noted, the estate was taxed in California only on such income as Monroe derived from California sources, rather than on income from *all* sources. The fact that the estate was double taxed on certain income thus does not rebut the court's conclusion that Frosch successfully advanced a position and gained an advantage by successfully urging California inheritance tax authorities to find that Monroe was a domiciliary of New York at the time of her death.

**90.** The court acknowledges that, unlike the Inheritance Tax Law, California's personal income tax laws do not use residence and domicile synonymously in every instance. Under the personal income tax law, a "resident" includes "(1) [e]very individual who is in this state for other than a temporary or transitory purpose[; and] (2)[e]very individual domiciled in this state who is outside the state for a temporary or transitory purpose." Cal. Rev & Tax.Code § 17014(a). An individual is deemed to be outside the state for a temporary or transitory purpose while she "(1) [h]olds an elective office of the government of the United States, or (2)[i]s employed on the staff of an elective officer in the legislative branch of the government of the United States ..., or (3)[h]olds an appointive office in the executive branch of the government of the United States." *Id.*, § 17014(b). A "nonresident" is "every individual other than a resident." *Id.*, § 17015.

This definition of resident is designed "to insure that all those who are in California for other than a temporary or transitory purpose enjoying the benefits and protection of the state, should in return contribute to the support of the state." *Whittell v. Franchise Tax Bd.*, 231 Cal.App.2d 278, 285, 41 Cal.Rptr.

that Monroe was domiciled in New York at the time of her death, it would appear that either this court or the California taxing authorities had been misled were plaintiffs to prevail on their argument that Monroe died a California domiciliary.[91]

673 (1964). "Under [it,] a person may be a resident for income tax purposes although domiciled elsewhere and vice versa." *Id.;* see also 18 Cal.Code Regs. § 17014 ("Under this definition, an individual may be a resident although not domiciled in this State, and, conversely, may be domiciled in this State without being a resident").

Despite the differing definitions, the BOE's application of the nonresident personal income tax law to Monroe is entirely consistent with the inheritance tax determination that Monroe was domiciled in New York.

**91.** Plaintiffs contend defendants have not shown that Frosch acted with "intent to deceive" the California tax authorities regarding Monroe's domicile. See *Wyler Summit Partnership*, 235 F.3d 1184, 1190 (9th Cir.2000) ("The doctrine of judicial estoppel requires, *inter alia*, a knowing antecedent misrepresentation by the person or party alleged to be estopped and prevents the party from tendering a contradictory assertion to a court" (citation omitted)). It is clear that Frosch intentionally advanced the position that Monroe was domiciled in New York at the time of her death, and that his position in this regard was not the result of inadvertence or mistake. See *EaglePicher Inc.*, 2007 WL 2265659 at *3 (in applying judicial estoppel, a court must look to "whether the party to be estopped acted inadvertently or with any degree of intent").

The entire purpose of Frosch's "Affidavit Concerning Residence" was to present facts regarding Monroe's domicile to the inheritance tax appraiser. Plaintiffs admit this, asserting that the residence affidavits were "prepared years after Marilyn's death for the express purpose of trying to avoid tax liability at a time when the Monroe Estate was believed to be insolvent." (Pl.'s Opp. at 21). Plaintiffs also assert that Frosch's Residence Affidavit was "patently inconsistent with the objective, contemporaneous evidence," and that the other residence declarations were "riddled with blatant inaccuracies." (*Id.* at

### c. Whether It Is Appropriate to Estop a Party on the Basis of Statements Made by the Party's Representative

Plaintiffs contend that courts estop parties based on positions taken by a privy in earlier litigation only when applying the doctrines of claim or issue preclusion. They argue that there are virtually no reported cases in which a court has held that a party is judicially estopped to assert a position because of a prior inconsistent position taken by the party's privy. This assertion is incorrect. See, e.g., *Capsopoulos on behalf of Capsopoulos v. Chater*, No. 95 C 3274, 1996 WL 717456, *2 (N.D.Ill.Dec.9,1996) ("Although judicial estoppel has generally been applied only where the identical party has taken the contradictory positions, a party in privity with the original party may also be estopped under judicial estoppel.... [T]he justification for applying for judicial estoppel is present in this matter. Decedent and his privy, Plaintiff, have adopted contradictory positions, each suiting the needs of the moment. Decedent won SSI disability benefits by claiming he had not worked and could not work. Now Plaintiff seeks to win survivor benefits by claiming that decedent had been working all along. Judicial estoppel is meant to apply to exactly this type of behavior, where self-interest rather than truth determine the argument of the day"); see also *Maitland*, 43 F.3d at 363–64 (under the doctrines of collateral estoppel, equitable estoppel, promissory estoppel, and judicial estoppel, "the party who is to be estopped, *or one in privity with that party,* must have asserted a fact or claim, or made a promise, that another party relied on, that a court relied

on, or that a court adjudicated" (emphasis added) (citations omitted)).

Plaintiffs, moreover, do not adequately articulate why it is inappropriate to apply judicial estoppel where, as here, the privy who took the prior inconsistent position clearly acted for the benefit of the present parties. It is true that the doctrine of "virtual representation" must be carefully applied. This case, however, presents precisely the type of situation in which it is equitable to invoke the doctrine. See *Gonzalez v. Banco Cent. Corp.*, 27 F.3d 751, 761 (1st Cir.1994) (noting that "virtual representation is best understood as an equitable theory rather than as a crisp rule with sharp corners and clear factual predicates, ... such that a party's status as a virtual representative of a nonparty must be determined on a case-by-case basis," and observing that important considerations in applying the doctrine are "actual or constructive notice of the earlier litigation" and whether "there has been 'an express or implied legal relationship in which parties to the first suit are accountable to non-parties who file a subsequent suit raising identical issues,'") (citing, *inter alia, Stone v. Williams*, 970 F.2d 1043, 1058–61 (2d Cir.1992) (holding that a decedent's son was bound by a prior ruling concerning the paternity of an illegitimate daughter of the decedent), cert. denied, 508 U.S. 906, 113 S.Ct. 2331, 124 L.Ed.2d 243 (1993); see also *Tyus v. Schoemehl*, 93 F.3d 449, 454 (8th Cir.1996) (noting that courts attempting to determine whether to employ the equitable doctrine of virtual representation often require that there be "an express or implied legal relationship in which parties to the first suit are accountable to non-parties who file a subsequent suit raising identical issues," and that

21–22). Given plaintiffs' characterization of the content and purpose of the documents, the fact that the inheritance tax appraiser relied on them in determining that Monroe

was domiciled in New York is strong, uncontroverted evidence that a quasi-judicial body was misled by a "knowing antecedent misrepresentation."

"[e]xamples of such a relationship would be ' "estate beneficiaries bound by administrators ... and a trust beneficiary by the trustee" ' "); cf. *Becherer v. Merrill Lynch, Pierce, Fenner, and Smith, Inc.*, 193 F.3d 415, 431 (6th Cir.1999) (Moore, J., concurring) (noting that the doctrine of virtual representation "originated in probate practice, in which it is often necessary to bind absent interests")); 18A Charles Alan Wright, Arthur R. Miller & Edward H. Cooper, FEDERAL PRACTICE AND PROCEDURE § 4457 at p. 513 (2008) ("The virtual representation phrase is drawn from probate proceedings, in which it is often necessary to establish a procedure that will bind persons unknown, unascertained, or not yet born. The need to bind nonparties in such circumstances is apparent. Protection is provided for the nonparties, moreover, by requiring representation by someone with clearly aligned interests").

■ The Ninth Circuit has identified certain factors that should be considered in deciding whether a party to prior litigation was the virtual representative of a party to current litigation. These include whether there is a close relationship between the parties; whether the parties shared an identity of relevant interests; whether the current party participated in the prior action; whether the prior party engaged in tactical maneuvering; and whether the prior party adequately represented the interests of the current party. See *Irwin v. Mascott*, 370 F.3d 924, 929–30 (9th Cir.2004) ("In short, a close relationship, substantial participation, and tactical maneuvering all support a finding of virtual representation; identity of interests and adequate representation are necessary to such a finding"). Here, these criteria are largely satisfied. Plaintiffs' predecessors had a close relationship and were in privity with Frosch, as they were the beneficiaries of the estate for which he served as executor. See *id.* at 930 (senior corporate officer had close relationship with corporation and its president). Plaintiffs themselves assert that Frosch was engaged in tactical maneuvering to ensure that Monroe was deemed to be a domicile of New York for tax purposes. Most importantly, there was a complete identity of interests regarding the tax issue between Frosch and those now contending that Monroe was domiciled in California at the time of her death.[92] For all of these reasons, the court concludes it is appropriate, on the

**92.** Plaintiffs contend there is no evidence that Lee Strasberg and Marianne Kris participated in the inheritance tax proceedings. It is clear, however, that Frosch was acting for their individual benefit, and that Strasberg and Kris had reason to acquiesce to the positions he took. Under California law, "[a]n 'estate tax' is levied on the right to transmit property, while an 'inheritance tax' is levied on the right to receive property. The 'transferee of the property in respect to the transfer of which the tax is imposed' is liable for payment of the tax." *Allen v. Flournoy*, 26 Cal.App.3d 774, 780, 103 Cal.Rptr. 275 (1972) (citing *Estate of Hyde*, 92 Cal.App.2d 6, 206 P.2d 420 (1949); CAL. REV & TAX.CODE § 14101). Inheritance tax is paid out of the property transferred to the beneficiary. See *Cohn v. Cohn*, 20 Cal.2d 65, 67–68, 123 P.2d 833 (1942) ("Generally speaking, the state assesses the privilege of succeeding to property, and computes the tax upon the interests of the legatees or devisees and the degree of relationship, if any, to the decedent. The tax is not one of the expenses of administration or a charge upon the general estate of the decedent; it is collectible out of each specific share or interest to which the beneficiary succeeds, and not from the general property of the estate" (citations omitted)); *In re McLaughlin's Estate*, 243 Cal.App.2d 516, 520, 52 Cal.Rptr. 543 (1966) ("Although, as an administrative matter, the personal representative pays the tax in the first instance, the transferee is ultimately liable for the tax out of the property transferred" (citations omitted)). Under New York law, by contrast, "[t]he New York tax on property passing at death is an 'estate tax,' taxable 'on the transfer of the New York taxable estate,' not an 'inheritance tax' imposed on or computed with reference to the receipt of property by estate beneficiaries." *In re O'Brine's Estate*, 37 N.Y.2d 81, 85, 371 N.Y.S.2d 453, 332 N.E.2d 326 (1975).

facts of this case, to hold that plaintiffs are judicially estopped to take a position contrary to that which their predecessors' representative took in the inheritance tax proceedings.[93]

### d. Whether a Party Can Be Estopped By an Executor's Statements About Domicile

Plaintiffs argue that even if their position is inconsistent with that taken by Frosch, they cannot be estopped by an executor's statements regarding domicile. They cite several cases for the proposition that "[a]n executor cannot change the actual domicile of the testator by his own admissions or allegations after the testator's death. Such admissions are beyond the province of the executor." See *In re Mulhern's Estate*, 31 A.D.2d 317, 297 N.Y.S.2d 485, 487 (App.Div.1969); see also *Kanz v. Wilson*, 703 So.2d 1331, 1340 (La.

---

It appears from the inheritance appraiser's report that, because Monroe was found to be a domiciliary of New York, only $64 in tax was paid from property transferred to Lee Strasberg. (See Soni Decl., Exh. N.) No inheritance tax was assessed on property transferred to Kris. (*Id.*) Had Monroe been deemed a domiciliary of California, however, tax would have been taken from Strasberg's and Kris's respective shares based on *all* property transferred by Monroe, not just property located in California. In arguing in the inheritance tax proceeding that Monroe was domiciled in New York, therefore, Frosch was clearly acting to preserve and protect the assets transferred to Strasberg and Kris. This too supports a finding of virtual representation.

**93.** After the court entered this order, the United States Supreme Court decided *Taylor v. Sturgell*, 523 U.S. ——, 128 S.Ct. 2161, 171 L.Ed.2d 155 (2008). *Taylor* does not alter the analysis or the result in this case. The Supreme Court there considered lower court rulings that held a plaintiff was precluded from pursuing a Freedom of Information Act claim because another plaintiff, in an earlier case, had been unsuccessful in obtaining the documents sought from the Federal Aviation Administration. The first plaintiff was a "close associate" of Taylor's, had discussed having Taylor assist in restoring the first plaintiff's airplane, and was represented by the same lawyer whom Taylor subsequently retained. *Id.* at 2168–69. The lower courts held that the first plaintiff had been Taylor's "virtual representative," and thus that Taylor was estopped from pursuing his claim. *Id.* at 2169. The D.C. Circuit, in particular, relied on a broad five-factor test in determining whether preclusion on the basis of virtual representation was appropriate. See *id.* (noting that under the D.C. Circuit's test, "the

first two factors—'identity of interests' and 'adequate representation'—are necessary but not sufficient for virtual representation.... In addition, at least one of three other factors must be established: 'a close relationship between the present party and his putative representative,' 'substantial participation by the present party in the first case,' or 'tactical maneuvering on the part of the present party to avoid preclusion by the prior judgment'"). The Supreme Court noted the general "rule against nonparty preclusion," *id.* at 2172, and the exceptions to it. Although certain of the cases cited in this order use the term "virtual representative," and although the court has briefly discussed the Ninth Circuit's test for determining virtual representation, which is similar to that utilized by the D.C. Circuit in *Taylor*, the bulk of the court's order focuses on the applicability of two of the six recognized exceptions to the rule against nonparty preclusion noted by the Supreme Court in *Taylor*: (1) "nonparty preclusion may be justified based on a variety of pre-existing 'substantive legal relationship[s]' between the person to be bound and a party to the judgment," and (2) "'in certain limited circumstances,' a nonparty may be bound by a judgment because she was 'adequately represented by someone with the same interests who [wa]s a party' to the suit." *Id.* Because the court finds that these recognized exceptions apply irrespective of the Ninth Circuit's "virtual representation" test, *Taylor* has no effect on the outcome. As the *Taylor* Court observed, "though references to 'virtual representation' have proliferated in the lower courts, our decision is unlikely to occasion any great shift in actual practice. Many opinions use the term 'virtual representation' in reaching results at least arguably defensible on established grounds." *Id.* at 2178.

App.1997); *In re Rosenfield's Estate,* 76 N.Y.S.2d 177, 179 (Sur.Ct.1944) ("[A]n allegation of the domicile of the testator in the petition for probate is not an estoppel against a subsequent application for the determination of the true domicile"); *In re Grant's Estate,* 144 N.Y.S. 567, 83 Misc. 257, 260 (Sur.Ct.1913) ("An executrix cannot change the actual domicile of the testator by her own admissions after testator's death, nor can she do so by her own acts, even if amounting to an estoppel as against herself. Such acts and admissions are beyond the province of executors in such matters as this").

The present situation is distinguishable from the cases cited by plaintiffs. In several, the court determined that an executor or beneficiary who sought to prove a decedent's domicile was not estopped by the executor's declaration supporting admission of the decedent's will to probate in a particular jurisdiction. In *In re Mulhern's Estate,* for example, a testator's surviving spouse sought to determine the validity of her election to take an intestate share of the estate under New York's Decedent Estate Law. *In re Mulhern's Estate,* 297 N.Y.S.2d at 486. The executor sought to introduce evidence regarding the testator's domicile that was relevant to whether the law of the Province of Ontario or the law of New York applied. *Id.* The Surrogate's Court refused to consider the evidence, holding that the executor was estopped to argue that the law of any jurisdiction other than New York applied because he had alleged in a petition for probate of the decedent's will that the testator died a resident of Erie County, New York. *Id.* at 486–87. The Appellate Division determined that estoppel did not apply because the decree admitting the will to probate did not adjudicate the testator's domicile or residence, and because the executor's earlier declaration was not necessary to confer jurisdiction on the Surrogate's Court. Rather, jurisdiction existed, the

court said, because the testator had died in Erie County and left personal property there. *Id.* at 487. The Appellate Division concluded that

> "[w]here, as here, the executor does not attack the jurisdiction of the court rendering the decree and where the fact of decedent's residence within the territorial jurisdiction of the court is not essential to confer jurisdiction upon the court even though it is the only jurisdictional fact recited in the petition for probate, the parties to the probate proceeding are not estopped from thereafter disputing the allegations of the petition for probate as to the testator's domicile." *Id.*

The court in *In re Rosenfield's Estate* explained why a declaration in a petition for probate does not estop further litigation over domicile. There, a co-executor who was also a residuary legatee sought to challenge the validity of the widow's election to take her intestate share against the provisions of the will under certain provisions of the Decedent Estate Law. *In re Rosenfield's Estate,* 76 N.Y.S.2d at 178. The co-executor asserted that the widow was estopped from exercising her statutory rights because, *inter alia,* she had been one of the proponents of the probate proceeding. *Id.* The court found this contention unavailing because "[w]here a will is validly executed by a competent testator free from und[ue] influence, a person named as executor in it is under a duty to offer it for probate and to procure its admission by decree. Under such circumstances a proponent is never barred from asserting after probate his or her rights in a construction proceeding or in a proceeding for the determination of a right of election as a surviving spouse or in an accounting or in any other form of proceeding." *Id.* at 178–79.

The court noted that various problems could arise after a will was admitted to probate that might require further proceedings. It noted that "[e]ven an allegation of the domicile of the testator in the petition for probate is not an estoppel against a subsequent application for the determination of the true domicile." *Id.* at 179. The reason estoppel does not apply, the court stated, was that "[i]n all of these proceedings the elementary rule is that probate logically precedes construction for otherwise there is no will to construe. The widow is not estopped in any manner whatsoever, therefore, from asserting her right of election conferred upon her by law." *Id.* (citations omitted).

Each of these cases is distinguishable, in that the statements made by the party against whom estoppel was sought were made only to get the will admitted to probate. As the court noted in *In re Rosenfield's Estate*, initial administration of the will is a necessary prerequisite to determining how it will be construed and how the decedent's property will be distributed. In *In re Mulhern's Estate*, moreover, the court noted that the declaration of domicile was not necessary to admission of the will to probate. Here, by contrast, the statements Frosch made that underlie defendants' estoppel argument were not made merely in securing admission of Monroe's will to probate in New York. They were made in a separate proceeding before the California tax authorities to obtain tax benefits for the estate.[94] Frosch submitted an affidavit and obtained declarations from other witnesses; the ap-

praiser requested additional evidence; a hearing was held, a determination as to Monroe's domicile was made; and tax was assessed accordingly. It is quite clear that the question of Monroe's domicile was adjudicated in the California tax proceedings; it was, in fact, the central issue in the proceeding. *Rosenfield's Estate* and *Mulhern's Estate* simply do not stand for the proposition that after such an adjudication has occurred, the executor and/or parties in privity with him are not estopped from making an inconsistent claim regarding the decedent's domicile.

*Kanz v. Wilson,* another cased cited by plaintiffs, is also distinguishable. In *Kanz,* the executor of a decedent's estate sought a judgment in Louisiana against the decedent's niece declaring that certain funds were the property of the estate and awarding the full amount of the funds to the executor. *Kanz,* 703 So.2d at 1333. The executor argued that the decedent had died a domiciliary of Louisiana, although her will had been admitted to probate in Texas. The niece sought to estop the executor from making this argument, citing sworn statements he made in the Texas probate proceeding that the decedent was domiciled in Texas at the time of her death. *Id.* at 1340.

Applying state law, the court determined that the executor's earlier statements were "extrajudicial" admissions that could estop him only under circumstances that were not present. Under Louisiana law, a "judicial admission" has two elements: "(1) it must be an expressed artic-

94. At the time he submitted the Affidavit Concerning Residence and sought a legal determination regarding Monroe's domicile for tax purposes, Frosch was in the same legal position as the individuals in *Mulhern's Estate* and *Rosenfield's Estate* who disputed domicile, and was not estopped from seeking a determination of Monroe's true domicile. Stated differently, applying the rule in *Mul-*

*hern's Estate* and *Rosenfield's Estate,* Frosch could have argued that Monroe was domiciled in a state *other* than New York at the time of her death, and would not have been estopped from doing so based on statements he made in getting the will admitted to probate. Neither case suggests that the same is true for statements made to secure a specific adjudication of the issue, however.

ulation of an adverse fact, sufficient to dispense with the need for any further evidence; [and] (2) the adverse party must have believed the fact was no longer an issue or must have detrimentally relied on it." See *Terrell v. Town of Merryville*, 886 So.2d 1278, 1282 (La.App.2004) (Thibodeaux, C.J., dissenting); see also *Kanz*, 703 So.2d at 1340 (" 'The Louisiana jurisprudence is clear that such an 'extra-judicial' confession does not bind the claimant in subsequent litigation. The party who has made such an admission in a previous suit is not barred from denying the facts contained in that admission in a subsequent suit, unless the adverse party has been prejudiced by his reliance upon that admission. Rather, the admission is to be given the probative value it deserves as an admission of the party who made it,' " quoting *Alexis v. Metropolitan Life Ins. Co.*, 604 So.2d 581, 582 (La.1992)). Because "appellant [did] not maintain she [had] been prejudiced by relying on statements made by [the executor] regarding domicile in the probate proceedings," the court concluded that the executor was not estopped by his previous position regarding domicile. *Kanz*, 703 So.2d at 1340. In dicta, the court observed that even had it considered the executor's statements, they would have had "no probative value regarding a determination as to [decedent's] domicile [because] the actual fact of residence and a real intention of remaining there, as disclosed by a person's entire course of conduct, are the controlling factors in ascertaining that person's domicile." *Id.*

*Kanz* is not controlling because it was decided under a body of state law that conflicts with the federal law governing judicial estoppel. As noted, a federal court applies the federal law of judicial estoppel. See *Rissetto*, 94 F.3d at 603. Unlike Louisiana law, federal law does not require that a party seeking to estop another on the basis of prior judicial statements have detrimentally relied on the prior statements. The federal law of judicial estoppel focuses on the effect of a party's prior inconsistent statement on the court, not on the litigants; it therefore does not require privity or detrimental reliance on the part of the party seeking to invoke the doctrine. See *Burnes v. Pemco Aeroplex, Inc.*, 291 F.3d 1282, 1286 (11th Cir.2002) ("The doctrine of judicial estoppel protects the integrity of the judicial system, not the litigants; therefore, numerous courts have concluded, and we agree, that '[w]hile privity and/or detrimental reliance are often present in judicial estoppel cases, they are not required,' " quoting *Ryan Operations G.P. v. Santiam–Midwest Lumber Co.*, 81 F.3d 355, 360 (3d Cir.1996), and citing *Patriot Cinemas, Inc. v. General Cinemas Corp.*, 834 F.2d 208, 214 (1st Cir.1987) (same), and *Edwards v. Aetna Life Ins. Co.*, 690 F.2d 595, 598 (6th Cir.1982) (same)); see also *Wagner*, 354 F.3d at 1044 ("Judicial estoppel is an equitable doctrine that is intended to protect the integrity of the judicial process by preventing a litigant from 'playing fast and loose with the courts' " (citation omitted)).

Additionally, the *Kanz* court stated that the domicile issue was not fully adjudicated in the Texas probate proceedings. As *Kanz* notes, domicile is "disclosed by a person's entire course of conduct." *Kanz*, 703 So.2d at 1340. It thus appears that, in contrast to Frosch's submissions in the California tax proceeding, the executor in *Kanz* did not present evidence regarding the decedent's course of conduct, such as where she owned property, voted, paid taxes, attended church, or had family. Here, of course, Frosch presented such evidence to the tax appraiser and obtained a favorable determination regarding domicile.

Plaintiffs' final citation is to *In re Grant's Estate,* 83 Misc. 257, 144 N.Y.S. 567, which involved a transfer tax proceeding respecting the estate of General Frederick Dent Grant, the son of President Ulysses S. Grant. *Id.* at 258, 144 N.Y.S. 567. The tax appraiser determined that Grant was not domiciled in New York and therefore refused to tax the estate. *Id.* The comptroller appealed to the Surrogate's Court, which likewise determined that Grant was not domiciled in New York at the time of his death. *Id.* In reaching this conclusion, the court noted that the will had been probated in New York based on an assertion that Grant had been a resident of New York; it also observed that the executrix had submitted an affidavit to the tax appraiser alleging Grant's residence in New York. *Id.* at 260, 144 N.Y.S. 567. The court reasoned, however, that "these things [were] not conclusive upon the actual question" of Grant's last domicile, because "[a]n executrix cannot change the actual domicile of the testator by her own admissions after [a] testator's death." *Id.* The court therefore permitted the executrix to argue that Grant was actually domiciled in Washington D.C. when he died. *Id.*

Although *Grant's Estate* appears to speak to the issue joined in this case, in that the declarations in the transfer tax affidavit did not estop the executrix from later changing her position, the court finds it unpersuasive. *Flatauer v. Loser,* 156 A.D. 591, 141 N.Y.S. 951 (N.Y.App.Div. 1913), the case on which the Surrogate's Court relied in determining that estoppel did not apply, was later reversed on that very point. See *Flatauer v. Loser,* 211 N.Y. 15, 19, 104 N.E. 1123 (1914) ("That the surrogate of the county of New York determined that Flatauer at the time of his death was an inhabitant of that county; that he died possessed of certain personal property and left a last will and testament, which was there admitted to probate, and

letters testamentary thereon issued to defendant—appears upon the face of the complaint. Such adjudication cannot be collaterally attacked in this action" (citation omitted)). Furthermore, later cases have applied *Grant's Estate* only to situations in which the party against whom estoppel is sought made statements regarding domicile or residence in seeking admission of a will to probate. See *In re Moran's Will,* 180 Misc. 469, 39 N.Y.S.2d 929, 936 (Sur.Ct.1943) ("Since this Court holds that domicile was not requisite to the taking of jurisdiction in the Cuban protocolization and testamentary proceedings and such courts otherwise had jurisdiction and did assume jurisdiction on the ground of 'death' in Cuba, the doctrine of estoppel urged by objectant by reason of petitioner's appearance in those proceedings and her subsequent acts and statements here and in Cuba will not be applied as a bar to litigating that issue here"); *In re Riley's Will,* 148 Misc. 588, 591, 266 N.Y.S. 209 (Sur.Ct.1933) ("The statements in the power of attorney and the later will which state that decedent was 'of the Village of Castile' are not conclusive in fixing decedent's last domicile"); *In re Riley's Estate,* 86 Misc. 628, 630, 148 N.Y.S. 623 (Sur.Ct. 1914) ("It is to be gathered from these statements that it was decedent's intention to be considered a resident of Mexico, and that the recital in his will 'now of the city of New York' and in the codicil 'of New York' are mere descriptive recitals and should not be regarded as conclusive in fixing decedent's last domicile"); *In re Mesa's Estate,* 87 Misc. 242, 253, 149 N.Y.S. 536 (Sur.Ct.1914) ("Grants of probate or administration are not conclusive as to the death of a testator or intestate. Nor are they conclusive of the last domicile or residence of the deceased" (citation omitted)). As applied by subsequent courts, therefore, *Grant's Estate* adds nothing to the court's analysis of *Mul-*

*hern's Estate* and *Rosenfield's Estate,* and is distinguishable for similar reasons.

Indeed, in a later case, the Surrogate's Court did not follow *Grant's Estate* and applied an estoppel based on statements regarding domicile in estate tax affidavits. In *In re Slade's Estate,* 154 Misc. 275, 276 N.Y.S. 956 (Sur.Ct.1935), executors asserted in an initial proceeding seeking admission of a will to probate in New York, that the decedent was a nonresident of New York and resided in Paris at the time of his death. *Id.* at 957. When the decedent's widow later sought to exercise her right of election under the Decedent Estate Law, the executors stated that the decedent "may have been a resident of New York and not of the republic of France." *Id.* at 958. The court rejected this contention because the issue had already been adjudicated in an estate tax proceeding. It reasoned:

> "In so far as this contention is made by the executors, it is clear that it is without foundation since they are concluded and estopped by their own petition for probate in which the testator was stated to be a non-resident and by the decree admitting the will to probate upon that petition. *In addition to the verified representations in the probate proceeding, they unequivocally stated in the estate tax proceeding that the decedent was a resident of France and not of the State of New York. Supporting evidence of the domicile of the decedent was also supplied by them and upon their representations the succession of the property was exempted from the estate tax in this State by the formal order of the surrogate.* The widow likewise is estopped in the present situation from questioning the determination in the probate proceeding that her husband was a nonresident of this State. She executed and filed the usual waiver and consent to the admission of the will to probate. It was within her power to have litigated the

issue of domicile in the probate proceeding, or upon presentation of proper extenuating circumstances to have moved directly to vacate the decree in probate for the purpose of reopening and having determined the actual domicile of the testator. She sought neither of these remedies, in all probability, because her husband was not a resident of this State and proofs to sustain a contrary finding must necessarily have been lacking." *Id.* at 958–59 (emphasis added).

The court finds the analysis in *In re Slade's Estate* more persuasive than that in the cases cited by plaintiffs. It therefore concludes that plaintiffs can be estopped by Frosch's statements in the California tax proceedings, and must consider, as a result, whether plaintiffs would derive an unfair advantage or defendants suffer an unfair detriment if judicial estoppel is not applied.

### 7. Whether Plaintiffs Would Obtain an Unfair Advantage or Impose an Unfair Detriment on Defendants if Not Estopped

As noted, judicial estoppel "precludes a party from gaining an advantage by taking one position, and then seeking a second advantage by taking an incompatible position." *Rissetto,* 94 F.3d at 601 (citations omitted). In the California tax proceedings, Frosch and his lawyers, acting on behalf of beneficiaries of the estate, sought and received a determination that Monroe was domiciled in New York at the time of her death. The estate and its beneficiaries obtained a resulting advantage, since inheritance tax was assessed only on Monroe's real and tangible personal property in California. See 18 Cal.Code Regs. §§ 617, 664–666 (1945). More specifically, the estate was taxed only on $92,761 of California property, and did not pay inheritance tax on Monroe's intangible property, which reportedly included more than

$70,000 in stocks and bonds, mortgages, notes, cash, and insurance.[95] If, as plaintiffs now claim, Frosch's position regarding domicile was inaccurate and Monroe was indeed domiciled in California, the estate and beneficiaries were not legally entitled to the tax advantage they received, and it was therefore unfairly obtained.

Plaintiffs in this case seek to advance a position inconsistent with that taken by the estate in the prior proceeding and obtain a second advantage. They contend that Monroe was domiciled in California at the time of her death because California domicile is a necessary prerequisite to their ability assert Monroe's statutory posthumous right of publicity. As the court has discussed extensively in prior orders, under California Civil Code § 3344.1, as recently clarified by SB 771, celebrities who died within 70 years of 1985 are deemed to possess a posthumous right of publicity at the time of their death that can be expressly bequeathed by will or transferred to the residuary beneficiary under the deceased celebrity's will. See CAL. CIV.CODE § 3344.1(b).

Plaintiffs claim to have acquired Monroe's posthumous right of publicity from her residuary beneficiary, Lee Strasberg. To demonstrate that they have standing to assert the right, however, plaintiffs must first establish that Monroe herself possessed the right. This requires a showing that she was domiciled in California at the time of her death.[96] See, e.g., N.Y. EST. POWERS & TRUSTS LAW § 3–5.1(b)(2) (formerly DECEDENT EST. LAW § 47) ("The intrinsic validity, effect, revo-

cation or alteration of a testamentary disposition of personal property, and the manner in which such property devolves when not disposed of by will, are determined by the law of the jurisdiction in which the decedent was domiciled at death"); *In re Moore's Estate*, 190 Cal. App.2d 833, 841–42, 12 Cal.Rptr. 436 (1961) (recognizing that, under California Civil Code § 946, a decedent's personal property should be distributed according to the law of his or her domicile); see *Shaw Family Archives, Ltd. v. CMG Worldwide, Inc.*, 434 F.Supp.2d 203, 210–11 (S.D.N.Y.2006) ("[Under the Indiana choice of law rule,] its courts apply the substantive law of the place of the tort.... In property cases, Indiana seems to adhere to the majority view that the law of the situs of the property governs. The situs of intangible personal property, such the Marilyn Monroe publicity right, is the legal domicile of its owner," citing *Van Dusen v. Barrack*, 376 U.S. 612, 638–39, 84 S.Ct. 805, 11 L.Ed.2d 945 (1964)).

If plaintiffs successfully advance a position regarding Monroe's domicile that is inconsistent with the position Frosch took in the inheritance tax proceedings, they will gain the advantage that they can assert Monroe's right of publicity. Because the estate and its beneficiaries clearly benefitted from the determination that Monroe was a New York domiciliary in the California tax proceedings, however, plaintiffs, by asserting an inconsistent position here, are obtaining an unfair advantage and attempting to "play fast and loose with the courts."[97] Cf. *In re Stroh*, 34 Fed.

---

**95.** Soni Decl., Exh. O. The value of Monroe's intangible property was potentially far greater than $70,000. In a petition for determination of estate tax filed in the Surrogate's Court in New York, the estate claimed more than $750,000 in "other miscellaneous property." (*Id.*)

**96.** As noted, New York—where Frosch and the estate claimed Monroe was domiciled—

does not recognize a descendible, posthumous right of publicity. See, e.g., *Pirone*, 894 F.2d at 585–86.

**97.** In asserting a judicial estoppel defense, defendants need not establish that they were in privity with any party in the California tax proceeding or that they relied on Frosch's statements in that proceeding. See *In re*

Appx. 562, 565 (9th Cir.2002) (Unpub.Disp.) ("[R]egardless of whether Stroh would now benefit from his lawsuit against Grant, Stroh derived an unfair advantage when he deceived the bankruptcy court into closing his case. Thus, the bankruptcy court's application of judicial estoppel was necessary to preserve the integrity of the bankruptcy process").

In sum, all the relevant factors favor application of judicial estoppel here: plaintiffs currently take a position that is inconsistent with that intentionally advanced by Frosch and the estate in the California inheritance tax proceedings; the inheritance tax appraiser accepted and relied on Frosch's assertions that Monroe was domiciled in New York at the time of her death; and plaintiffs, having benefitted from Frosch's assertions because their predecessors were beneficiaries under Monroe's will, would gain an unfair advantage if permitted now to establish that Monroe was in fact domiciled in California. See *New Hampshire*, 532 U.S. at 751, 121 S.Ct.

*Coastal Plains, Inc.*, 179 F.3d 197, 205 (5th Cir.1999) ("Because the doctrine is intended to protect the judicial system, rather than the litigants, detrimental reliance by the opponent of the party against whom the doctrine is applied is not necessary," citing *Matter of Cassidy*, 892 F.2d 637, 641 & n. 2 (7th Cir. 1990), cert. denied, 498 U.S. 812, 111 S.Ct. 48, 112 L.Ed.2d 24 (1990)); *In re Chambers Dev. Co., Inc.*, 148 F.3d 214, 229 (3d Cir. 1998) ("The party asserting the estoppel is not required to demonstrate detrimental reliance upon the prior representation" (citation omitted)); *United States v. $186,416.00 in U.S. Currency*, 527 F.Supp.2d 1103, 1124 (C.D.Cal. 2007) ("Judicial estoppel generally applies only where a court relies on and accepts a party's past position. UMCC's reply brief focuses nearly exclusively on its own reliance, which is not pertinent to the analysis"). The court notes, however, that defendants plausibly argue that they will suffer an unfair detriment if plaintiffs are permitted to contend that Monroe was a California domiciliary at the time she died because defendants have made business decisions in reliance on plaintiffs' repeated assertions that Monroe died a domiciliary of New York. Defendants contend that "they believed they had a right to license their copyrighted photos because of the Estate's repeated public sworn attestations that Ms. Monroe was a domicile of New York when she died. Defendants knew that no [right of publicity] survived the death of Ms. Monroe since she was domiciled in New York when she died." (Def.'s Reply at 14.)

Defendants apparently reference not only the statements made by the estate in the inheritance tax proceeding, but also its various representations regarding Monroe's residence in probate proceedings in California and New York. Frosch and Anna Strasberg, who was appointed administratrix c.t.a. of the Monroe estate in 1989 and who is a named party in this litigation, made various representations to the Surrogate's Court regarding the fact that Monroe was a resident and/or domiciliary of New York at the time of her death. (See, e.g., Soni Decl., Exhs. O (Frosch asserting in a 1969 Surrogate's Court petition for the determination of estate tax that Monroe died a resident of New York); X (Frosch asserting in a 1980 petition for final accounting that Monroe died a resident of New York); Y (Strasberg stating in a 1989 petition for letters of administration that Monroe died a resident of New York); AA (Strasberg stating in a 1989 petition for construction of Monroe's will that she "died on August 5, 1962, domiciled in the City and State of New York")).

Defendants' reliance on these statements is understandable, as the terms domicile and residence are often used synonymously in probate law as well. See, e.g., *In re Glassford's Estate*, 114 Cal.App.2d 181, 186, 249 P.2d 908 (1952) ("While residence has different meanings for different purposes, it is plain that residence as used in section 301, [California] Probate Code, is synonymous with domicile"); *In re Britton's Will*, 100 N.Y.S.2d 969, 971 (Sur.Ct.1950) ("Exclusive jurisdiction to probate the will of a decedent rests in the Surrogate's Court of the county where the decedent was, at the time of his death, a resident, whether his death happened there or elsewhere. Residence as used in this section is synonymous with and denotes domicile," citing Surrogate's Court Act, § 45 and *Matter of Greene's Will*, 186 App. Div. 903, 172 N.Y.S. 894 (N.Y.App.Div.1918)).

1808. Compare, e.g., *In re Parker*, 204 Fed.Appx. 598, 600 (9th Cir.2006) (Unpub.Disp.) ("The bankruptcy court did not abuse its discretion in declining to apply the doctrine of judicial estoppel against the Resort. The Resort gained no 'unfair advantage' from advancing the position that the Rodriguez deed of trust resulted from mutual mistake because the Arizona Supreme Court rejected its private plat dedication theory, resulting in the district court's reversal of the bankruptcy court's initial grant of summary judgment. When a party advances a position that is ultimately rejected on appeal, that party may advance an alternative theory in future proceedings with no risk of inconsistent court determinations" (internal quotations and citations omitted)).

■ Plaintiffs have raised no triable issues of fact respecting any of the factors. Stated differently, they have not "sufficiently explained" the inconsistency. See *Cleveland*, 526 U.S. at 806, 119 S.Ct. 1597. Consequently, the court concludes that the doctrine of judicial estoppel bars plaintiffs from asserting that Monroe was domiciled in California at the time of her death.[98] As a result, it reconsiders its prior ruling and grants defendants' motion for summary judgment on plaintiffs' statutory right of publicity claims, as these are dependent on establishing that Monroe was a California domiciliary.

### III. CONCLUSION

For the reasons stated, defendants' motion for reconsideration is granted. On reconsideration, the court grants defendants' motion for summary judgment on

[98]. Because the court determines that plaintiffs are judicially estopped by the statements made in the California tax proceedings, it need not consider defendants' additional ar-

plaintiffs' right of publicity claims on judicial estoppel grounds.

guments that they are judicially and collaterally estopped by statements made in a proceeding in the district court for the District of Hawaii. (See Def.'s Mot. at 9–14, 30).